Bow **HERBERT** and Nancy Herbert, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 19935.

United States Court of Appeals Ninth Circuit.

Dec. 30, 1966.

Dissenting Opinion April 4, 1967.

Concurring Opinion April 24, 1967.

Rehearing Denied May 31, 1967.

Tavares, District Judge, dissented.

George M. Bryant, Clyde R. Maxwell, Robert E. Guilford, Daniel R. Sheahan, Robert A. Hinshaw, J. W. Allyn, of Bryant, Maxwell, Guilford & Sheahan, Los Angeles, Cal., for appellants.

Richard M. Roberts, Acting Asst. Atty. Gen., Louis F. Oberdorfer, Asst. Atty. Gen., Meyer Rothwacks, Robert N. Anderson, Carolyn R. Just, Attys., Tax Div., U. S. Dept. of Justice, Mitchell Rogovin, Chief Counsel, Henry Kutz, Atty., Internal Revenue Service, Washington, D. C., for appellee.

Before JERTBERG and MERRILL, Circuit Judges, and TAVARES, District Judge.

JERTBERG, Circuit Judge:

Before us is a petition for review of a decision of the Tax Court involving asserted deficiencies in income tax against petitioners for the fiscal years ending September 30, 1958, September 30, 1959, and September 30, 1960, in the aggregate amount of $54,476.61.

The petitioners, husband and wife, filed joint income tax returns for the fiscal years in question. The Commissioner asserted that petitioners understated their income in their income tax returns for each of said years. On petition for redetermination by the Tax Court, that Court upheld the deficiency determination made by the Commissioner.

Hereafter for convenience, petitioner, Bow Herbert, will be referred to as the taxpayer, and only incidental reference will hereafter be made to petitioner, Nancy Herbert.

It appears from the record that during the tax years under review, and for several years prior thereto, there were two limited partnerships composed of the petitioners, as general partners, and in the case of the Gardena Club, Adam S. Campbell, Michael M. Wind, Murray Klein and taxpayer as limited partners, and in the case of the Horseshoe Club, Ben Cohen, Michael M. Wind, and A. S. Campbell and taxpayer as limited partners. Each partnership owned and operated a draw poker parlor located in the City of Gardena, the operation of which was legal under the laws of the State of California and the ordinances of the City of Gardena, and each was duly licensed to so operate by the City of Gardena.

The taxpayer was the managing partner of both partnerships, which derived their income from the rental of seats to the general public at poker tables where legalized gambling was permitted. The partnership did not participate in the losses or winnings of the players. Additional income to each partnership was derived from the operation of restaurants and news stands on the premises, and from the sale of miscellaneous items.

The limited partnership known as the Horseshoe Club was acquired by taxpayer and associates in 1951 and a successor limited partnership was formed in 1956. The limited partnership known as the Gardena Club was acquired by taxpayer and associates in 1952, and a successor limited partnership was formed in 1955.

Amended certificates of the formation of the two limited partnerships were signed, filed and recorded as required by the Uniform Limited Partnership Act of the State of California, Section 15501 et seq., of the Corporations Code of the State of California.

Pertinent parts of the certificates of limited partnership reveal:

That petitioners held 53% and that the other limited partners held 47% interest in the Horseshoe Club, and that each partner was entitled to receive profits of the partnership in accordance with his respective interest in the partnership;

That petitioners held 62% and that the other limited partners held 38%

interest in the Gardena Club, and that each partner was entitled to receive profits of the partnership in accordance with his respective interest in the partnership;

That books of account be kept of all transactions of each partnership at the principal place of business of the partnership, and be at all times open for the inspection and examination of each partner;

That monies of the Gardena Club were to be deposited in a bank account and that withdrawals from said account were to be made by check signed by one general partner and either one of two specified limited partners.

Taxpayer received salary from each club in the following amounts:

| Year Ended | Horseshoe | Gardena |
|---|---|---|
| 9–30–58 | $23,850.00 | $20,605.00 |
| 9–30–59 | $23,400.00 | $20,280.00 |
| 9–30–60 | $26,000.00 | $10,920.00 |

During the tax years under review, and prior years, it was the practice of each partnership to deposit, periodically, partnership funds into an account designated "Bow Herbert, Personal Account", maintained in the United California Bank, Crenshaw Branch.

Checks deposited to said account were drawn on the partnership bank account, and in the case of the Gardena Club were signed either by the taxpayer or an employee of the partnership and one of the designated limited partners; and in the case of the Horseshoe Club were signed by the taxpayer or an employee of the partnership. Such deposits were charged in the books of each partnership to the following accounts:

*The Horseshoe Club*
    Other Expense Account      Public Relations      Account #418
*The Gardena Club*
    Other Expense Account      Public Relations      Account #674.

The "Bow Herbert, Personal Account" was segregated from the taxpayer's other accounts and other personal financial affairs of the taxpayer.

During the tax years in question there was deposited in the "Bow Herbert, Personal Account" the following amounts:

| Year Ended | Horseshoe Club | Gardena Club |
|---|---|---|
| 9–30–58 | $19,500.00 | $13,000.00 |
| 9–30–59 | $19,500.00 | $13,000.00 |
| 9–30–60 | $19,500.00 | $ 5,000.00 |

Withdrawals from said account were made by checks prepared by club employees, signed by taxpayer, and drawn to cash in all except five instances.

Audit reports and periodic financial statements of both partnerships, reflecting deposits made by the partnerships to the "Bow Herbert, Personal Account", were distributed to the limited partners.

The partnerships did not claim deductions in their tax returns for the deposits made by the partnerships into the

68

"Bow Herbert, Personal Account." The amounts of said deposits were reported as income on the individual tax returns of the members of the partnerships.

During the years in question, and prior years, taxpayer made no accounting to the partnerships or to the limited partners with respect to the disbursement of funds from the "Bow Herbert, Personal Account."

The limited partnerships continued in existence until December 31, 1961, at which time an Amended Certificate of each limited partnership was signed, filed and recorded as required by law.

Under the Amended Certificate of each limited partnership:

1. The limited partners became also general partners along with petitioners, who also remained limited partners;

2. The new general partners acquired co-signing authority on all checks drawn against the partnership bank accounts; and

3. The taxpayer remained as the managing partner at a salary of $65.00 per day, seven days a week, in the Gardena Club, and $75.00 per day, seven days a week, from the Horseshoe Club.

Contemporaneously with the signing, filing and recording of the Amended Certificates, each of the limited partnerships entered into a written agreement with taxpayer whereby taxpayer was employed as managing general partner, to manage and conduct the business of the limited partnership, at the salaries specified in the certificates. The agreement respecting the Gardena Club provides in paragraph 7 as follows:

"7. (Public Relations Funds) Managing General Partner shall receive from the Limited Partnership the sum of SEVEN HUNDRED FIFTY DOLLARS ($750.00) per accounting period for public relations expenses of the Limited Partnership. (An accounting period shall be of not less than four (4) weeks' duration). Such amount shall be a charge to the Limited Partnership as a cost of doing business and

shall not be considered compensation to Managing General Partner. Managing General Partner shall receive said public relations funds from the Limited Partnership for the purpose of disbursing said funds for and on behalf of the Limited Partnership for public relation purposes of the Limited Partnership, provided that, nothing to the contrary herein withstanding, Managing General Partner shall not be required by the Limited Partnership or any member thereof to account for the expenditure of such fund or funds."

Paragraph 7 of the Management Agreement relating to the Horseshoe Club is identical except that the amount specified therein is the sum of $1500.00 per accounting period. The provisions of paragraph 7, except with respect to the amount of public relations expenses for each accounting period, are in conformity with the practices which prevailed during the years in question and prior years.

The Amended Certificates of the limited partnerships of December 1961, and the Managing General Partner Agreements of that year were the products of a settlement of litigation instituted in 1959 in the state court by the limited partners against the taxpayer. The litigation arose because of taxpayer's refusal during the years in question, and prior years, to disclose to the limited partners the identity of the recipients of money disbursed by taxpayer from the "Bow Herbert, Personal Account." As stated in the findings of the Tax Court:

"The limited partners wanted to know where the money was spent. Petitioner would not tell them and refused to disclose the identity of the recipients."

Notwithstanding such disputes the record establishes that during the years in question and prior years the "public relations" accounts were maintained and disbursements therefrom were made solely by taxpayer without accounting to the limited partners as to the disposition thereof.

In the deficiency assessment the Commissioner determined:

"It has been determined that you [Mr. Herbert and his wife] received income of $19,500 from the Horseshoe Club, and $13,000 from the Gardena Club, partnerships, in each of the taxable years ended September 30, 1958, September 30, 1959, and September 30, 1960, purportedly for use as partnership promotional expenses. The total amount of $32,500 represents income under the provisions of section 61 of the Internal Revenue Code, and no part of it is deductible since you have failed to establish that any of the amounts were expended and are deductible under the provisions of the Code."

By stipulation filed in the Tax Court proceedings, it was stipulated that the amount deposited by the Gardena Club to the "Bow Herbert, Personal Account" for the year ended September 30, 1960, was the sum of $5,000 instead of the sum of $13,000, as set forth in the Commissioner's determination.

The only issue presented to the Tax Court for redetermination under the pleadings filed by the parties was whether petitioners received income in the amounts deposited by the partnerships in the "Bow Herbert, Personal Account" in the years in question. The taxpayer made no claim in the petition filed with the Tax Court that he was entitled to an offsetting deduction in respect to any part of the partnership's funds deposited in said account.

The Tax Court sustained the Commissioner's determination "that the 'Public Relations' money received by petitioner was taxable income to petitioner in the years of the controversy, and that no part thereof is deductible as an ordinary and necessary business expense."

The "ultimate findings" made by the Tax Court are:

"1. Petitioner failed to prove that the amounts he received in the form of cash, denominated as 'public relations' money, was not an item of taxable income during the fis-

cal years ended September 30, 1958, 1959, and 1960.

"2. Petitioner failed to prove that the 'public relations' money he received during the years in issue was expended for tax deductible purposes."

The general rule is that the burden of proof is on the Commissioner to establish that the taxpayer received income. However, the Commissioner's determination of a deficiency satisfies such burden since the determination made by the Commissioner is presumptively correct. The taxpayer then has the burden of overcoming this presumption by a preponderance of the evidence. American Pipe and Steel Corp. v. Commissioner of Internal Revenue, 243 F.2d 125 (9th Cir.), cert. denied, 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261 (1957). When the taxpayer has overcome the presumption by competent and relevant evidence, the presumption disappears and drops out of the case. J. M. Perry & Co., Inc. v. Commissioner of Internal Revenue, 120 F.2d 123, 124 (9th Cir. 1941); Clark v. Commissioner of Internal Revenue, 266 F.2d 698, 706 (9th Cir. 1959); Cohen v. Commissioner of Internal Revenue, 266 F.2d 5 (9th Cir. 1959); Hemphill Schools, Inc. v. Commissioner of Internal Revenue, 137 F.2d 961 (9th Cir. 1943).

The above authorities and the cases therein cited support the rule that the Commissioner and not the taxpayer then has the burden of proving whether any deficiency exists, and if so, the amount. It is not incumbent upon the taxpayer under these circumstances to prove that he owed no tax, or the amount of the tax which he did owe.

In the instant case relevant and competent evidence received on behalf of petitioners establishes that the checks deposited in the "Bow Herbert, Personal Account" were drawn on bank accounts belonging to and standing in the names of the partnerships, and, as found by the Tax Court, were paid to taxpayer "as general managing partner". There

is not a scintilla of evidence in the record which tends to prove, or from which it may be reasonably inferred, that taxpayer was to receive as income from either partnership any amounts other than his salary and the amount of his percentage interest in the profits of the partnership.

The evidence is clear and uncontradicted that the funds of the partnerships, deposited in said account, were partnership funds and that withdrawals from said account by taxpayer remained partnership funds in his hands.

In our view such testimony on behalf of the taxpayer overcame the presumption arising from the Commissioner's determination that the taxpayer received income from the two clubs during the years in question in the amounts specified in the deficiency assessment made by the Commissioner. . Any use of said funds by taxpayer for other than partnership purposes would constitute the crime of embezzlement by taxpayer of funds belonging to the partnerships, and would be contrary to the terms of the certificates of partnership.

The Commissioner made no contention in the Tax Court, and makes no contention before us, that the partnerships were sham and used by taxpayer for the purpose of defrauding the government of taxes to which it is entitled. In other words, the bona fides of the partnerships is not questioned by the Commissioner or by the Tax Court.[1]

The facts upon which we base our determination that the evidence offered by the taxpayer overcame the presumption of correctness arising from the Commissioner's determination is made without any reference to any testimony of the taxpayer which the Tax Court characterized as "incredible."

The presumption of correctness having disappeared from the case, the burden of proof that taxpayer received income from the two clubs in the years in question was upon the Commissioner and the ultimate redetermination by the Tax Court was required to be made on all of the evidence in the record, unaided by the presumption, and be supported by substantial evidence. See cases cited supra, and Kaufman v. Commissioner of Internal Revenue, 372 F.2d 789 (4th Cir. 1966).

Our final task is to determine whether or not the Commissioner sustained the burden of proof which was upon him to establish that the taxpayer received as income from either of the two clubs, in the years in question, any part of the amounts deposited in the "Bow Herbert, Personal Account", and whether or not the redetermination by the Tax Court is supported by substantial evidence. Such determination by us must be based solely upon the relevant and competent evidence produced by the taxpayer and the Commissioner.

We have carefully examined all of the evidence appearing in the record. We believe it is unnecessary to further review the same here because our examination compels us to agree with the statement appearing in the opinion of the Tax Court that "the record contains no evidence that petitioner personally profited by an increase in assets or a decrease in liabilities, * * *." It is further stated in the Tax Court opinion:

"The money came into petitioner's hands. Once it got there the only way he could avoid paying income tax on it was to prove that he was entitled to an offsetting deduction by substantiating his expenditure of the money

---

1. The facts of this case are significantly distinguishable from the facts in cases relied upon by the Commissioner, which he states support the proposition that when funds are subject to taxpayer's sole use, dominion and control, such amounts must be attributed as income to the person receiving them. The cases cited are Hel-

vering v. Horst, 311 U.S. 112, 119, 61 S. Ct. 144, 85 L.Ed. 75; Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L. Ed. 788; Shaw Construction Co. v. Commissioner of Internal Revenue, 323 F.2d 316 (9th Cir. 1963); Kuney v. Frank, 308 F.2d 719 (9th Cir. 1962).

as an ordinary and necessary business expense. This he has failed to do."

And

"The failure to trace cash into assets, a burden which the respondent does not have here, does not show that the petitioner had no income. For all we know he may have spent the cash for his personal benefit."

██ The burden of proof was not upon the taxpayer to show that he had no income. The burden was upon the Commissioner to establish that the taxpayer received the money as income. It appears to us that the Tax Court has confused the burden of establishing receipt of income with the burden of supporting allowable deductions from income. In the former case the burden is on the Commissioner, and in the latter case the burden is upon the taxpayer. As previously noted, the taxpayer made no claim before the Tax Court that he was entitled to an offsetting deduction in respect to any part of the partnership funds deposited in said account. Such was not an issue in the Tax Court proceedings. The injudicious statement of the Tax Court that: "For all we know he may have spent the money for his personal benefit" cannot be substituted for competent and relevant evidence. Such statement cannot be based upon other than sheer suspicion, conjecture and speculation.

The same vice appears in the "ultimate findings" made by the Tax Court, quoted supra, in which it is stated that the petitioner failed to prove that the amounts he received in cash, denominated as "public relations" money was not an item of taxable income and that petitioner failed to prove that the "public relations" money he received during the years in issue was expended for tax-deductible purposes.

In our view the Tax Court erred in placing the burden of proof on the taxpayer to establish that he had no income instead of placing upon the Commissioner, where it belonged, the burden of establishing that petitioner realized income.

We entertain the definite and firm conviction that a mistake has been made and the Court's findings of ultimate fact are clearly erroneous. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

The decision of the Tax Court is reversed.

TAVARES, District Judge (dissenting).

The decision of the majority, as far as it goes, correctly sets forth many of the facts in this case. However, it seems to me that the majority opinion fails to give to these facts, and to additional facts not mentioned therein, the significance to which they are entitled, and from which interpretations and implications can reasonably be drawn which would justify the result reached by the Tax Court. In the following discussion I will attempt to point this out.

Although appellants Bow Herbert and his wife, Nancy Herbert, during the years in question (hereinafter sometimes called the "tax period") were the two sole general partners of each limited partnership involved herein—namely, the Horseshoe Club and the Gardena Club—it is undisputed that, from the standpoint of control and management, Mrs. Herbert was a mere figurehead, and appellant Bow Herbert was for all practical purposes, the sole general partner and managing partner of each of these limited partnerships. It is my understanding that California laws as to limited partnerships, like those of most jurisdictions in this country, do not permit limited partners to take any part whatsoever in the management or operations of the limited partnership. The significance of this feature, I submit, has been erroneously overlooked by the majority.

With his own and his wife's interests as general and limited partners, and the interests of all the other limited partners whom he represented as trustee, Bow Herbert controlled a majority of all of the limited and general partnership beneficial interests in both partnerships. This fact, again, although casually mentioned

by the majority, is, I feel, erroneously given no special significance.

In giving passing mention to the fact that the limited partnership known as the Horseshoe Club and the limited partnership known as the Gardena Club, were acquired by taxpayer and associates in 1951 and 1952 respectively, the majority again overlooks the significance of the historical fact that in each instance Bow Herbert acquired sole control for all practical purposes, of each of the predecessor businesses that ultimately became the Horseshoe and Gardena Clubs, and proceeded to lay down *his own arbitrary terms* upon which he permitted his associates to purchase minority limited partnership interests in each of these concerns, and that the *policy and practice of awarding himself this so-called "public relations" allowance each month, to be expended by him without accounting therefor to anyone else*, were *laid down by him personally before the limited partnerships in question were formed and were continued throughout the tax period upon his insistence and through his overwhelming individual power of control*, which permitted him to dictate all the terms upon which anybody was allowed to buy in to each limited partnership business.

Thus we find a situation which existed before either of the limited partnerships in question came into existence, whereby Bow Herbert set aside so much money periodically, insisted that it could be spent by him personally without accounting to anybody to whom he paid the money or for what purpose it was spent, and called it "public relations." Then he created the limited partnerships in question, saw to it that he retained sole individual control of the management functions and majority control of all beneficial interests in each partnership, and perpetuated his previous practices with relation to these so-called "public relations" moneys. It was thus Bow Herbert who created the situation, Bow Herbert who laid down the terms, and Bow Herbert who made it impossible for anybody (including any sub-sequent purchasers of limited partnership interests—or the Internal Revenue Service)—*to ever determine* whether he was spending the money for bona fide public relations purposes, or otherwise.

To justify its conclusion that:

"The evidence is clear and uncontradicted that the funds of the partnerships, deposited in said account, were partnership funds and that withdrawals from said account by taxpayer remained partnership funds in his hands.",

the majority relies upon alleged actions of the minority limited partners, which the majority appears to view as giving support and credence to Bow Herbert's contention that the moneys so set aside were in truth and in fact bona fide partnership funds paid over to him for bona fide partnership purposes, and spent for legitimate partnership public relations purposes.

The majority gives controlling, and, in fact, incontrovertible effect, to the relations between Bow Herbert and each limited partnership as a separate entity—(ignoring the fact that what they are really talking about is the actions of one individual dealing with himself—Bow Herbert wearing his individual hat, and Bow Herbert wearing his other hat as the individual who in effect absolutely controlled each limited partnership and *dictated arbitrarily what the limited partners must permit him to do)*. Thus the majority points out:

(1) That each partner, limited or general, was entitled to receive profits of the partnership in accordance with his respective interests therein (this by itself proves nothing);

(2) That the other limited partners (not represented by Bow Herbert and his wife individually or as trustee) held a 38% interest in the Gardena Club and a 47% interest in the Horseshoe Club (ignoring the fact that in a limited partnership the limited partners have *no control over the actual management and op-*

*eration of the partnership,* not even as much as stockholders and directors of a corporation) ;

(3) That books of account were required to be kept of all transactions of each limited partnership, and were to be at all times open for inspection and examination of each partner (overlooking the fact that Bow Herbert hired the accountants and told them what records to keep and what *not* to account for—namely, the public relations moneys, as to which, over the repeated protests of the limited partners, only the amounts paid to Bow Herbert as purported public relations moneys were to be accounted for—and not how and *for what purposes he actually expended them);*

(4) That moneys of the Gardena Club were to be deposited in a bank account and that withdrawals from said account were to be made by check signed by one general partner and either of one or two specified limited partners (failing to give any significance to testimony which indicated that, notwithstanding such purported requirement, Bow Herbert would ignore the same whenever he wished, and write checks on that account without such co-signature, which was one of the reasons for the litigation in 1959) ;

(5) That during the tax years under review and prior years it was the practice of each partnership (which really means Bow Herbert) to deposit periodically partnership funds into an account designated "Bow Herbert, Personal Account" in the United California Bank, Crenshaw Branch.

(6) That checks deposited to said account were drawn on the partnership bank account and in the case of the Gardena Club were signed either by Bow Herbert or an employee of the partnership (which means someone hired and subject to be fired by Bow Herbert), and one of the designated limited partners; and in the case of the Horseshoe Club were signed by Bow Herbert or an employee of the partnership (which again means someone hired, and subject to be fired, by Bow Herbert);

(7) That such deposits were charged in the books to each partnership to the following accounts:

"The Horseshoe Club

"Other Expense Account Public Relations Account #418

"The Gardena Club

"Other Expense Account Public Relations Account #674,"

(ignoring the fact that Bow Herbert was the one who required the funds to be set up and operated in this way) ;

(8) That the Bow Herbert Personal Account was segregated from Bow Herbert's other accounts and other personal financial affairs of Bow Herbert (again failing to mention that this was done only because Bow Herbert himself required it) ;

(9) That withdrawals from said account (the "Bow Herbert, Personal Account") were made by checks prepared by club employees (each of whom was hired and subject to be fired by Bow Herbert alone), signed by him—except in five minor instances—and drawn to cash (again a practice required by Bow Herbert and objected to by the limited partners) ;

(10) That audit reports and periodic financial statements of both partnerships reflecting deposits made by the "partnerships" (which really means by Bow Herbert) to the "Bow Herbert, Personal Account" were distributed to the limited partners (again these reports were in a form required by Bow Herbert, and objected to by the limited partners) ;

(11) That the limited partnerships did not claim deductions in their tax returns for the deposits made by them into the "Bow Herbert, Personal Account." Of course, Bow Herbert was the one who directed the tax accountants, hired by him, to make the returns, to do this, *and the reason for the limited partnerships not claiming such deductions* for supposedly legitimate partnership expenditures, for supposedly legitimate partnership purposes—"Public Relations"—*was that,*

*since Bow Herbert refused to disclose* the alleged partnership purposes and *the payees to whom he paid out these deposit moneys, the limited partnerships could not substantiate such deductions as business deductions.*

On the very face of it, this very unusual and very unorthodox method of doing business—where it is claimed that the business is paying out money for legitimate partnership purposes, and yet the business consistiently fails and refuses to keep detailed accounts, or to disclose the details of such supposedly legitimate business expenditures, thereby forcing the business and the co-owners thereof to forego the benefits of what ought to be legitimate tax deductions—indicates something very wrong.

One can understand how in a particular occasion, through inadvertence, loss of receipts or otherwise, there would be excusable failure to so keep accounts of alleged legitimate business expenditures, but here we have a practice advisedly and persistently continued over many years, involving very substantial amounts of money, so that the failure to account is not an exception, but the rule, and the invariable rule.

In my humble opinion, the Internal Revenue Service should not be compelled to accept such self-contradictory practices as proof of legitimate partnership or business activities. Hence my feeling that the majority's finding that Bow Herbert received these moneys as partnership moneys for partnership purposes is not sound;

(12) That the amount of said deposits was reported as income on the individual tax returns of the members of the partnerships (which only means that they *had* to do this to conform to Bow Herbert's arbitrary method of doing business) ;

(13) That during the years in question and prior years Bow Herbert made no accounting to the partnerships or to the limited partners with respect to the disbursement of funds from the "Bow Herbert, Personal Account" (a feature which was a constant bone of contention by the limited partners) ;

(14) That the limited partnerships were changed by the filing, on December 31, 1961, of Amended Certificates of limited partnership whereby: (a) the limited partners also became general partners along with petitioners, so that they all were limited and general partners; (b) that the new general partners acquired co-signing authority on all checks drawn on the partnership bank accounts and (c) that Bow Herbert remained as managing partner at a stated salary per day seven days a week in each club, and that (d) contemporaneously with the signing, filing, and recording of the Amended Certificates, each of the limited partnerships entered into a written agreement with Bow Herbert, whereby he was employed as managing partner and was to be paid a certain amount per four-week accounting period ($750.00 for the Gardena Club and $1,500.00 for the Horseshoe Club) which should be a charge to the limited partnership as a cost of doing business, and not considered compensation to the managing general partner; and that he should not be required to account for expenditures from such funds.

The majority states that the provisions of these 1961 agreements "are in conformity with the practices which prevailed during the years in question and prior years."

The majority also states, correctly, that the Amended Certificates of 1961 and the managing general partnership agreements of the same date "were the products of a settlement of litigation instituted in 1959 in the state court by the limited partners against the taxpayer. The litigation arose because of taxpayer's refusal * * * to disclose to the limited partners the identity of the recipients of money disbursed by taxpayer from the 'Bow Herbert, Personal Account.' "

The majority further correctly points out that the Tax Court found that "The limited partners wanted to know where

the money was spent. Petitioner would not tell them and refused to disclose the identity of the recipients."

The majority then ignores, in effect, the *significance* of the disputes between the limited partners and Bow Herbert during the years in question, and previous years, by stating, apparently as cinching their conclusion that the deposits were partnership moneys deposited and expended for partnership purposes:

"Notwithstanding such disputes the record establishes that during the years in question and prior years the 'public relations' accounts were maintained and disbursements therefrom were made solely by taxpayer without accounting to the limited partners as to the disposition thereof."

In so doing, the majority ignores the fact that the *very existence of these disputes* could be and were considered by the Tax Court *as proof tending to show that the so-called "public relations" deposits were not deposits for partnership purposes,* but were rather additional payments to Bow Herbert personally and that, unless Bow Herbert could show to the partners (which he consistently and arbitrarily refused to do) that the expenditures themselves were for partnership purposes, the limited partners considered them as payments to him for his personal purposes and not partnership disbursements for partnership purposes.

The fact that the limited partners took no action to stop these payments or deposits until 1959 is not proof per se that the limited partners agreed that these were partnership disbursements for partnership purposes, nor is it proof per se that they were in fact such. Inferences to the contrary would be just as reasonable from the facts of such arbitrary action by the sole (in effect) general and managing partner. The reason, of course, for the reluctance of the limited partners to go into court is obviously that unfavorable publicity from such litigation might jeopardize the entire enterprise.

The fact, however, that the partners finally got desperate enough to risk this kind of dangerous publicity by airing their grievances in public, could have been, and was obviously considered by the Tax Court as further proof that the deposits were not made for partnership purposes, but were to Bow Herbert personally, unless he could show that the expenditures were partnership expenditures as such, which, again he refused to do.

It seems to me that the majority fails to give any weight at all to the reasonable and plausible interpretations and inferences which could have been, and either obviously were drawn from these facts by the Tax Court, or should be adopted by this Court, in support of the Tax Court's final result:

(1) That the limited partners other than those controlled by Bow Herbert either acquiesced unwillingly and under duress, or never really acquiesced, and did not agree to, but protested consistently against, this secretive practice during the tax period.

(2) That the evidence in support of the proposition that paragraph 7 of the Management Agreement of 1961 as to each limited partnership exemplified also an oral agreement between the limited and general partners to the same general effect during the tax period preceding 1961, was conflicting, and the Tax Court was therefore justified in finding, in effect, to the contrary.

There is practically unanimous agreement by all the witnesses that, notwithstanding the alleged oral agreement in 1955, testified to by some of Bow Herbert's witnesses to the effect that Bow Herbert might continue and make these payments to himself for public relations, there was continuous bickering and dissatisfaction and disagreement, both before, during and after 1955 over Bow Herbert's absolute refusal to account to his limited partners for the *actual expenditure* of the "Public Relations" fund,

and frank disbelief on the part of limited partners Campbell, Wind and others as to Bow Herbert's truthfulness and honesty in claiming that the money was being spent for "Public Relations" purposes for the benefit of the partnership as distinguished from expenditures for Bow Herbert's personal benefit, and limited partners Wind and Campbell *even gave testimony tending to disprove* that this money was being expended for partnership purposes, by stating, among other things, that there was no necessity for actual expenditure of these moneys for purely partnership "Public Relations" purposes, and that various situations claimed by Bow Herbert to have existed necessitating such expenditures, did not in fact exist.

Not even the most trusted of Bow Herbert's employees in the limited partnerships could testify from personal knowledge that any part of this money was spent for "Public Relations" purposes, with the exception of some five checks, one of them for a political contribution. So all that we have here is the self-serving testimony of Mr. Bow Herbert as to how he actually expended the moneys, and the purpose for which he actually used to expend them, and did expend them. On the other hand, we have the testimony of limited partner Campbell that at least on one occasion, though not during the years in question, he discovered that Bow Herbert had entered in his personal books of account kept by his secretary, a reserve of $11,000.00, indicating that Bow Herbert had not spent all of the "Public Relations" money and must have allowed it to accumulate for some considerable time to reach that large amount.

There is other substantial testimony tending to impeach Bow Herbert's testimony, and that of some of his prime witnesses, which will not be repeated here.

(3) That if there was no agreement between all the partners during the tax period purporting to authorize such secretive practices and expenditures (and I respectfully submit that there was sufficient conflict in the evidence to justify the Tax Court's obvious finding to the contrary), then Bow Herbert violated a fiduciary duty to his limited partners, both before and during the period in question, in refusing and failing to disclose his expenditures from these deposits, which goes far to offset the presumption apparently indulged in by the majority that Bow Herbert did not embezzle these funds or commit a breach of trust, which presumption seems to be relied upon by the majority as evidence that the funds were received and spent by Bow Herbert as partnership funds and for partnership purposes.

By the way, the reliance of the majority upon the circumstance that any expenditure of the moneys in question by Bow Herbert for other than partnership purposes would be "contrary to the terms of the certificates of partnership" is strange, in view of the fact that these certificates, in the words of the majority, required:

"That books of account be kept of *all* transactions of each partnership * * *" (emphasis added),

a requirement that was grossly violated by the practices of Bow Herbert in recording *none* of the very numerous transactions he says he engaged in in expending these moneys in connection with alleged partnership transactions.

(4) That the limited partners only settled when: (a) Bow Herbert yielded in 1961 joint and equal fiscal control over the general funds of both partnerships by making all the limited partners also general partners, thus giving them veto power over general partnership expenditures; (b) Bow Herbert procured or made an assignment to the limited partners of the licenses, which had never been put in the names of the businesses (i. e., limited partnerships) previously; (c) Bow Herbert transferred certain real estate to the partnerships which he had theretofore refused to turn over to them; and (d) Bow Herbert reinstated Mr.

Wind's brother, Klein, in his job—in return for all of which, quite apparently the limited partners were willing to bargain away their right to an accounting for the so-called "Public Relations" moneys.

In other words, Bow Herbert in effect bought them out and stifled their objections to non-disclosure by making huge concessions in other respects.

Although the Tax Court could have used more appropriate language to support its ultimate conclusion that the taxpayer was liable for the additional taxes assessed by the Commissioner, it seems to me that a critical examination of the record as a whole clearly indicates that the Tax Court did not have to rely, and did not in fact rely, solely upon a presumption of the correctness of the Commissioner's determination, but rather that the Tax Court considered all of the facts of the case and on those facts made their final decision that the money in question was "income received" by Bow Herbert, and not partnership funds for expenditure for, and actually expended in, partnership purposes. If I am correct in this view, then it did become incumbent upon Bow Herbert to prove that he had spent the money for deductible purposes, and that is the meaning I derive from reading the Tax Court's decision as a whole in the light of the entire record.

If I am correct that there was substantial evidence from which it could reasonably have been inferred by the Tax Court that the moneys were not deposited to the "Bow Herbert, Personal Account" for partnership purposes but for Bow Herbert's personal purposes, then, even if the Tax Court gave an apparently wrong reason for holding as it did, the proper disposition of this case would be *not* to reverse the Tax Court as the majority opinion does, without more, thereby in effect requiring a judgment on the merits for appellants Bow and Nancy Herbert, but to do as was done in the cases cited by the majority opinion—reverse and remand for a determination based clearly only on the evidence and not on any presumption of the correctness of the Commissioner's findings that Bow Herbert received income. See Cohen v. Commissioner of Internal Revenue, 266 F.2d 5, 12 (9 Cir. 1959); Hemphill Schools, Inc. v. Commissioner of Internal Revenue, 137 F.2d 961, 964 (9 Cir. 1943); Kaufman v. Commissioner, No. 10,483, 4 Cir., Oct. 18, 1966, 18 Am.Fed.Tax Reps. 2d, 6031, paragraph 66–5293.

For the foregoing reasons, I respectfully dissent from the majority opinion filed December 30, 1966. I would affirm the judgment of the Tax Court.

MERRILL, Circuit Judge (Concurring with Judge Jertberg):

As the filing dates which the opinions herein bear indicate, the majority opinion was filed prior to, and without reference to, the dissent. I feel it appropriate under the circumstances to state that Judge Tavares has failed to dissuade me from my original concurrence with Judge Jertberg and, with the consent of my brothers, to add some thoughts of my own. In order that any petition for rehearing may address itself to all three opinions, I am authorized by the Court to state that judgment of the Court shall date from this final filing, and that respondent may, within the time prescribed by rule, supplement his petition now on file.

Behind the issues argued to us on which the Court has divided, a more modest question presents itself—one that seems to me to define the true dimensions of the controversy. I would state it as follows:

Where, by virtue of the peculiar nature of its business, an enterprise finds it necessary for business reasons to engage in a course of secret payments to undisclosed recipients, who should bear the tax consequences of the fact that such payments cannot qualify as deductible business expenses: the owners of the business, or the individual who is directly responsible for making the payments? We hold: the owners.

The principal dispute is as to the facts assumed by my statement of the question. I regard that dispute as laid to rest by the terms of the 1961 settlement.

As the dissent points out, appellant's partners had their disputes with him and were constantly grumbling over his secret operations. However, in resolving their differences in 1961 they ultimately agreed with appellant that the making of secret payments was necessary to their business. By their settlement agreement they continued to place under appellant's control a partnership fund for the purpose of making such payments, limited only as to amount. Further, in fixing those limits they agreed that the amount of secret payments anticipated as reasonably necessary for business operations was not substantially less than what appellant had drawn in the past. (It was, in fact, more than appellant had disbursed in one of the years in question.) Thus they apparently were satisfied, despite their past doubts, that appellant had disbursed the fund for business purposes. Further, by their agreement they recognized that the *super*-secrecy of the payments (secret even as to them), to which they had been objecting, was necessary for business purposes. Appellant was expressly given the authority he had asserted all along—to pay without need to account.

This is indeed (as the dissent emphasizes) an extraordinary way of doing business and suspicions as to the nature of such payments spring easily to mind. I do not find them relevant here, however. If the partners feel that such trust and secrecy is in the best interests of their unusual business enterprise, and settle their differences on such a basis, I see no reason to argue with them.[1]

Two conclusions seem to me to result: First, that no inference of misappropriation on the part of appellant can be drawn from the unusual methods of operation to which the partnership, for business reasons, has committed itself; second, that the tax consequences of such methods should be spread among the partners.

---

1. A case might well arise where the establishment of a partnership fund with freedom from accounting could give rise to inferences or suspicions that the partners had fraudulently entered into a conspiracy to pad the income of one partner. There is no contention that this is such a case.