RICHARD P. ROSENBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent,
PETWORTH PHARMACY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rosenberg v. Commissioner
Docket Nos. 7429-71, 7430-71.
United States Tax Court
T.C. Memo 1974-10; 1974 Tax Ct. Memo LEXIS 309; 33 T.C.M. (CCH) 31; T.C.M. (RIA) 740010; January 17, 1974, Filed Sylman I. Euzent, for the petitioners.
James J.Keightley, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and addition to tax as follows: 2 Petitioner
Docket Number
Taxable Year
Income Tax Deficiency
Addition to tax Sec. 6653(b) I.R.C. 1954
Richard P. Rosenberg
7429-71
1967
$ 32,383.00
$ 16,191.50
Richard P. Rosenberg
7429-71
1968
140,821.00
70,410.50
Richard P. Rosenberg
7429-71
1969
171,887.00
87,547.00
Petworth Pharmacy
7430-71
1969
13,200.02
-0-
The cases were consolidated for trial, briefs and *310 opinion.
The following issues are presented for decision:
1. Did Richard P. Rosenberg omit from his returns for the taxable years 1967, 1968 and 1969 gross receipts derived from illegal sales of a narcotic cough syrup, Robitussin AC?
2. If such sales were omitted did Richard P. Rosenberg thereby fraudulently underpay his tax within the meaning of section 6653(b) of the Internal Revenue Code? [1]
3. Was the compensation paid by Petworth Pharmacy to Richard P. Rosenberg for the taxable year 1969 unreasonable and, therefore, not deductible to the extent of $25,000? 3 FINDINGS OF FACT
Some of the facts have been stipulated. The stipulation of facts, together with the exhibits, are incorporated herein by this reference.
Petitioner Richard P. Rosenberg resided in Rockville, Md., at the time he filed his petition herein. He filed his Federal income tax returns for the taxable years 1967, 1968 and 1969 with the district director of internal revenue at Baltimore, Md.
Petitioner Petworth Pharmacy, Inc. (Petworth) was incorporated under the laws of the District of Columbia *311 in 1931 and has had its principal place of business in the District of Columbia up to and including the time it filed its petition herein. Petworth filed its Federal income tax return for the taxable year 1969 with the district director of internal revenue at Baltimore, Md. The officers of Petworth during the taxable years involved were Louis F. Rosenberg, president, Petitioner Richard P. Rosenberg, vice-president and Jerry Rosenberg, secretary-treasurer. Richard and Jerry were the co-managers of Petworth. Louis Rosenberg was the father of Richard and Jerry. Louis died on August 3, 1972.
Petworth, during the years involved here, sold drugs, patent medicines and sundries in the District of Columbia. It sold drugs and other medicines to the public, some of 4 which required a doctor's prescription and others which did not. Robitussin AC is a patented cough syrup which contains codeine. During the years in issue it could legally be sold in the District of Columbia to the public either by a doctor's prescription or in quantities of four ounces if the sale were recorded in an exempt narcotics registry book.
In late 1969 the District of Columbia Metropolitan Police Department *312 (D.C. Police) initiated an investigation of Petworth because of substantial purchases of Robitussin AC by Petworth from Washington Wholesale Drug Exchange (Washington Wholesale) and District Wholesale Drug Co. (District Wholesale).
Undercover agents of the D.C. Police attempted on two occasions in 1969 to purchase Robitussin AC from Petworth but were told by its employees that Petworth did not sell Robitussin AC.
In February 1970 the D.C. Police marked 25 cases of Robitussin AC at District Wholesale which were scheduled for shipment to Petworth. They observed the delivery of the marked cases to Petworth and agents of the Federal Bureau of Narcotics and Dangerous Drugs 5 kept the premises of Petworth under surveillance until some time later when they observed the removal of several cases of Robitussin AC to a station wagon owned by Richard Rosenberg. They followed the station wagon to Richard Rosenberg's home where its contents were unloaded and stored in the garage. Police and Federal agents maintained constant surveillance of the garage until some of the cases were removed and loaded into a vehicle which headed north, eluding the officers.
Search warrants were obtained *313 by the officers and on February 28, 1970, they entered Richard Rosenberg's home and garage and the business premises of Petworth. They seized 87 cases of Robitussin AC from Richard's garage. The labels on the outside of the cases had been removed. Each case contained 24 four-ounce bottles of Robitussin AC. In addition, the officers seized the sum of $103,420.23 in currency located in a desk drawer of Richard's home.
At the business premises of Petworth, the officers seized eight exempt narcotics registry books covering the period from September 1965 through February 1970. They reflected that the last sale of Robitussin AC sold by Petworth occurred on November 6, 1966. These records 6 were returned to Richard on October 4, 1971, by the D.C. Police.
Richard Rosenberg was convicted by a Maryland court for maintaining a common nuisance by reason of selling Robitussin AC from his home. Upon a plea of guilty, he was convicted by a District of Columbia court for failure to maintain the proper narcotics records.
Revenue Agent William F. Wampler, Jr., was assigned to examine the income tax returns of Richard Rosenberg and Petworth in order to account for the $103,000 in case *314 seized in the February 1970 raid. Richard Rosenberg furnished him virtually no personal records. Agent Wampler first attempted to reconstruct income by use of the net worth method but abandoned such technique when it failed to reveal more than an unexplained increase in net worth of $10,000 in 1969. By investigation, Agent Wampler learned that although Richard maintained a bank checking account he used cashier's checks for making a down payment on his personal residence in May 1969 and in acquiring shares of corporate stock. He was unable to learn, however, where the checks were purchased. Richard had a savings account at Washington National Savings and Trust with a balance of $21,000 which he closed in 1970 shortly after the raid. 7 Because the net worth method did not account for the large sums of cash seized in the raid and because of the large wholesale purchases of Robitussin AC by Petworth, Agent Wampler chose to reconstruct Richard's income by assuming that the Robitussin AC purchased by Petworth was sold by Richard and the income therefrom, or the profit therefrom, was omitted from Richard's income tax returns.
Richard reported the following on his Federal income *315 tax returns: Year
Gross Income
Taxable Income
1967
$10,200.00$ 8,312.38
1968
10,400.00
6,744.93
1969
14,375.00
$12,237.00
Richard reported no income on his returns from the sale of Robitussin AC.
Agent Wampler obtained copies of order forms for exempt drugs which Petworth used to purchase Robitussin AC from Washington Wholesale and District Wholesale. By the use of these forms and an examination of the books and records of Petworth, he reconstructed Richard Rosenberg's income which became the determination of the Commissioner in his statutory notice of deficiency. The books and records of Petworth were incomplete; therefore, 8 Agent Wampler obtained copies of invoices retained by Washington Wholesale and District Wholesale reflecting the sales of Robitussin AC to Petworth. These were obtained after the statutory notice was mailed and indicated that Petworth had purchased more Robitussin AC than had been attributed to it in the statutory notice of deficiency. Petworth did not produce all of its original invoices; therefore, it was necessary for Agent Wampler to rely on the records of third parties, the drug wholesale firms.
Petworth purchased *316 the following quantities of Robitussin AC at cost for the years indicated: 9 PETWORTH ROBITUSSIN AC PURCHASES
Four-ounce Bottles
Gallon Bottles
Cost
1967
Washington Wholesale
3,792
147
$ 8,430.30
District Wholesale
9,480
409
22,099.50
Total
13,272 (533 cases)
556
$ 30,529.80
1968
Washington Wholesale
16,704
676
$ 40,672.85
District Wholesale
18,768
785
45,751.50
Total
35,472 (1478 cases)
1,461
$ 86,424.35
1969
Washington Wholesale
21,620
932
$ 59,011.80
District Wholesale
24,576
1,000
65,135.20
Total
46,196 (1924 cases)
1,932
$124,147.00
Total Purchases
94,940 (3955 cases)
3,949
$241,101.15 10 The Robitussin AC which Petworth purchased from the wholesale drug firms was sold to Moses Mills of Baltimore, Md., who, in turn, sold it at retail through an illegal establishment known as a "syrup house." Mills was convicted of violations of the narcotics laws and maintaining a house of public nuisance. Mills' employee, William Holt, operated the "syrup house" in Baltimore. Holt was arrested in connection with illegal sales of narcotics and has been convicted of transportation *317 and possession of narcotics. Both Mills and Holt purchased cases of Robitussin AC during the years 1967, 1968 and 1969 from Richard Rosenberg and Jerry Rosenberg. Louis Rosenberg made no such sales. The purchases were made for cash and no business records, such as invoices or sales tickets, were prepared to reflect the purchases. Delivery of the cough syrup was effected at the business premises of Petworth but neither Mills nor Holt was asked to sign the Petworth exempt narcotics registry books as required by law. Such sales of Robitussin AC were not rung up on the Petworth cash register.
A pharmacist at Petworth for 30 years who was in charge of the prescription department at Petworth in 1967, 1968 and 1969, observed cases of Robitussin AC 10 a being loaded into Richard Rosenberg's automobile. The pharmacist personally made no large sales of Robitussin AC. He was neither an officer nor stockholder of Petworth.
Each illegal sale of Robitussin AC from the Rosenbergs to Mills and Holt was generally from $200 to $300. The cases of the cough syrup were sold to Mills and Holt at $55 each and gallon bottles were sold at $60 each. 11 Richard received the following *318 amounts of cash as gross sales from the illegal sale of Robitussin AC: 1967
$ 63,775
1968
168,950
1969
221,740
The net profit (gross sales less cost of Robitussin AC) from the illegal sales of Robitussin AC realized by Richard Rosenberg which he failed to report on his Federal income tax returns was as follows: 1967
$ 33,245
1968
82,526
1969
97,593
Richard Rosenberg failed to report the profit from the illegal sales of Robitussin AC on his Federal income tax returns for the taxable years 1967, 1968 and 1969 with the fraudulent intent of underpaying his income tax for each of such years.
Petworth did not report profits from the illegal sales of Robitussin AC on its Federal income tax returns although Petworth on its return for 1969 reported sales in excess of its books and records in the amount of $57,574, which were never identified nor explained. The increase in reported sales was made by Marvin Riibner, a certified public accountant, who prepared the Petworth return for 1969. He had no explanation of the adjustment. 12 Petworth maintained its books and records on the cash basis of accounting with year-end adjustments for changes *319 in accounts receivable, accounts payable, and inventory.Its records consisted of a checkbook, daily cash report, daily cash book and a monthly cash summary book. Its sales activities were divided into three categories: drugs, cigars (including candy), and miscellaneous. These categories were reflected in both the business records and the financial reports of the corporation. All sales were rung up on one of the two cash registers in the store. Prescriptions and miscellaneous sales were entered in the main cash register, and all other sales were entered in a cash register located at the cigar counter. Separate records were also maintained with respect to prescription sales and nonprofit sales such as wholesale sales made to other drug stores. Petworth's bookkeeper verified the entries in the daily cash report with the cash register tapes. After the report was verified, only the summary information from the bottom of the cash register tapes was retained and the remainder of the tape was destroyed.
The percentages of gross profits to sales of Petworth for the taxable years 1962 through 1968 were as follows: 13 Gross Sales
Cost of Goods Sold
Gross Profit % 1962
$182,254.74
$ 116,036.50
36.33
1963
187,310.66
116,199.72
37.96
1964
189,264.52
119,599.23
36.81
1965
193, 077.40
118,111.26
38.83
1966
203,743.06
127,724.67
37.31
1967
214,178.79
139,813.86
34.72
1968
283,134.28
201,713.80
28.76
*320 Petworth's gross profit percentage for 1969 (based upon its books and records) was 25.77 percent. Its gross profit percentage reflected in its income tax return for the same year, which included the additional sales of $57,574 not recorded in the books and records of the corporation, was 35.65 percent.
Petworth dispensed Robitussin AC by prescription during the years involved from a one-gallon bottle. It sold approximately one gallon per month in such manner. Such sales were made at a price of 33 1/3 percent markup over cost and were rung up on the cash register as drug sales.
Other sales of Robitussin AC made by Petworth during the years involved which it recorded on its books and records were reflected in the category of miscellaneous sales. Petworth's gross profit and percentage markup of miscellaneous sales for the years 1962 through 1965 were as follows: 14 1962
1963
1964
1965
4-Yr. Avg. Gross Miscellaneous Sales
$82,209.99
$85,549.86
$86,381.19
$86,398.59
Cost of Goods Sold
52,775.65
51,023.38
53,855.48
54,117.35
Gross Profit
$29,434.34
$34,526.48
$32,525.71
$32,281.24
Gross Profit %
35.80%
40.36%
37.65%
37.36%
37.79%
% Markup
55.77%
67.67%
60.31%
59.65%
60.85%
*321 15 Petworth first made substantial purchases of Robitussin AC in July 1966; therefore, the gross miscellaneous sales set forth above do not include substantial sales of Robitussin AC.
Revenue Agent Wampler applied the 60.85 percent, four-year average percentage markup of miscellaneous sales to the costs of items included in miscellaneous sales during the years 1967 to 1969. The costs of such items, exclusive of Robitussin AC were as follows: 1967
$64,376.57
1968
53,087.91
1969
70,229.43
Agent Wampler then compared the totals thus determined (hypothetical miscellaneous sales) to the actual miscellaneous sales of Petworth for the respective years with the following results: Actual Misc. Sales
Hypothetical Misc. Sales
Difference 1967
$ 94,383.17
$103,551.07
$ 9,167.90
1968
95,671.26
85,382.00
(10,289.26)
1969
111,363.14
112,964.00
1,600.86
Totals
$301,417.57
$301,897.07
$ 479.50 16 The Robitussin AC purchased by Petworth from Washington Wholesale and District Wholesale which the Commissioner determined to be sold by Richard Rosenberg during the years 1967, 1968 and 1969 was not sold by Petworth *322 in its business nor was it reflected as sold in the books and records of Petworth for such years.
The $57,574 in sales reported by Petworth on its return for 1969 which was not reflected on its books and records, was not income of Petworth's but was, instead, unreported income of Richard Rosenberg derived from his illegal sales of Robitussin AC.
The Federal income tax returns of Petworth for taxable years prior to 1969 were prepared by a certified public accounting firm. Following the raid on Richard Rosenberg's home in February 1970, the board of directors of Petworth, on March 10, 1970, discharged the certified public accounting firm. Petitioners' attorney had the 1969 returns for Petworth and Richard Rosenberg prepared by Marvin Riibner. They were filed in August 1970.
On its return for 1969, Petworth deducted $56,030 as the total compensation paid to its officers which included the amount of $39,675 paid to its president, Richard Rosenberg. 17 The Commissioner, in his statutory notice of deficiency, disallowed, as unreasonable, $25,000 of the total compensation paid to Richard Rosenberg in 1969. The amount disallowed represented a portion of a bonus of $25,300 purportedly *323 paid at the end of 1969. Richard did not report as income on his Federal income tax return for 1969 the bonus of $25,300 which Petworth deducted on its return.
The minutes of a special meeting of the board of directors of Petworth held on December 29, 1969, reflected authorization of a bonus to Richard Rosenberg in the amount of $5,000. The amount of $5,000 was subsequently erased and the sum of $25,300 was substituted. A copy of the minutes unaltered by the substitution of the amount was furnished to Agent Wampler by petitioners' attorney on April 30, 1971.
The meeting of December 29, 1969, was attended by Richard Rosenberg and Jerry Rosenberg. Richard Rosenberg voted a proxy dated December 23, 1969, from Louis Rosenberg. Only Richard Rosenberg and Jerry Rosenberg signed the minutes of the meeting of the board of directors of Petworth held on December 29, 1969, in their own behalf. Jerry Rosenberg executed such minutes on behalf of Louis Rosenberg. 18 The substitution of the amount was made in 1970 and was not authorized or ratified by the board of directors and the substitution was made for the purpose of explaining a source for a portion of the cash seized in the *324 February 1970 raid on Richard Rosenberg's residence.
The board of directors of Petworth on December 29, 1969, authorized a bonus to Jerry Rosenberg only in the amount of $5,000 for his efforts as vice-president of Petworth for 1967, 1968 and 1969.
The total compensation paid by Petworth to Richard Rosenberg for the taxable year 1969 was unreasonable to the extent of $25,000.
ULTIMATE FINDINGS OF FACT
1. Petitioner Richard Rosenberg omitted from his Federal income tax returns for the taxable years 1967, 1968 and 1969 the sums of $33,245; $82,526; and $97,593 derived from his illegal sales of Robitussin AC narcotic-based cough syrup.
2. The sums were not reported by Richard Rosenberg on his returns for the fraudulent purpose of underpaying his income tax for the taxable years 1967, 1968 and 1969. 19 3. Petworth erroneously reported as sales on its Federal income tax return for the taxable year 1969 the sum of $57,574 when, in fact, Petworth did not realize such sales but, instead, realized sales only to the extent reflected on its books and records.
4. The compensation paid by Petworth to Richard Rosenberg for the taxable year 1969 was excessive and unreasonable to the *325 extent of $25,000 and, therefore, not deductible by Petworth to that extent.
OPINION
The issues to be decided are:
(1) Did Richard Rosenberg omit income from his returns?
(2) If so, how much?
(3) Were the omissions fraudulent?
(4) Was the salary and bonus paid by Petworth to Richard Rosenberg reasonable in amount?
All of the issues are questions of fact.
The statutory notice of deficiency is presumed to be correct with respect to the deficiencies in income tax determined by the Commissioner. Foster v. Commissioner, 391 F.2d 727 (C.A. 4, 1968) remanding on another issue a Memorandum Opinion of this Court; Estate of Ernest Clarke, 54 T.C. 1149 (1970). 20 Petitioner Richard Rosenberg recognizes that he has the burden of proving that he did not receive the income from illegal sales of Robitussin AC which the Commissioner has charged to him.Richard Rosenberg argues, however, that the presumptive correctness of the statutory notice disappeared because it was arbitrary and excessive and the Commissioner bears the burden of proving that Richard Rosenberg received the income. He relies on some memorandum opinions of this Court which are not controlling *326 and upon Herbert v. Commissioner, 377 F.2d 65 (C.A. 9, 1966). That case is not in point because it involved uncontradicted testimony of the taxpayers with no countervailing proof by the Commissioner. There the Commissioner relied solely upon the presumptive correctness of the statutory notice of deficiency. In the case before us, the Commissioner did not rely on the presumptive correctness of the statutory notice but, instead, introduced clear and convincing evidence. Moreover, Herbert, supra, has been distinguished in like manner by the Court of Appeals for the Fourth Circuit, to which an appeal in the instant case would be made, in Foster v. Commissioner, supra.
The burden of proof is explained by the Fourth Circuit in Foster, supra, as follows: 21 Our understanding of the law with regard to this issue is as follows: The burden of proof is on the Commissioner to show that the taxpayer received income. This burden is initially satisfied, however, by the fact that the Commissioner's deficiency determination is presumed correct. The burden is thus on the taxpayer to prove the incorrectness of the deficiency determination. *327 This burden is procedural and is met if the taxpayer produces competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice. In other words, the taxpayer at this point has the burden of producing evidence or of going forward with the evidence. If this burden is met, the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency. [Footnotes omitted.]
The Court continued by commenting on the Herbert, supra, opinion as follows:
[It] simply [amounts] to [holdings] that the uncontradicted testimony of the taxpayers was such competent and sufficient evidence that the courts could find that the taxpayers had not received income, and, under the general rule, the introduction of such evidence destroyed the Commissioner's presumption of correctness with respect to the particular sums involved. The rule does not apply in this case because, in the words of the Tax Court, "The record in the present case contains no such credible evidence." [Footnote omitted.]
The test to be applied, therefore, is whether Petitioner Richard Rosenberg introduced such competent and *328 sufficient evidence that the presumptive correctness of the Commissioner's determination was destroyed. 22 We hold that Petitioner Richard Rosenberg failed to satisfy this test. We found the evidence of Petitioner Richard Rosenberg to be totally unconvincing.
As best we can fathom Petitioner Richard Rosenberg's position, he contends that he sold no Robitussin AC but Petworth did and Petworth reported all of the profit from its sales on its income tax returns. Jerry and Richard Rosenberg were the co-managers of Petworth and both of them testified as did a pharmacist who was in charge of the drug department of Petworth. None of them testified as to the identity of the purchaser of the large quantities of Robitussin AC. The pharmacist, who was employed by Petworth for 30 years, who has no reason not to tell the truth and whose testimony was uncontradicted, testified that during the hours that he worked at Petworth he saw cases of Robitussin AC delivered to Petworth, that only one gallon per month was sold by prescription, and that he observed cases of Robitussin AC loaded into Jerry Rosenberg's automobile.
Sgt. Edmond K. McKinnon of the D.C. Police who supervised the investigation *329 of Petworth which resulted in the raid, testified that the quantities of Robitussin AC purchased by Petworth were the largest he had encountered during his ten years' experience as an investigator with the narcotics branch. 23 To show that the large quantities of Robitussin AC were sold by Petworth, Petitioner Richard Rosenberg relies upon the books and records of Petworth yet at the same time admits that $57,574 in sales in 1969 never was entered on the books of Petworth and a bonus of $25,300 allegedly paid by Petworth to him in late 1969 was paid in cash from sales which not only were unrecorded on the books and records of Petworth, but also were never reported on the Federal income tax return of Petworth for 1969.
It may well be that the Rosenbergs were reluctant to testify that Petworth made the sales of Robitussin AC because Petworth, at the time of the trial herein, had pending before the Superior Court for the District of Columbia a case involving fraudulent underpayment of franchise tax for the years 1967, 1968 and 1969. The issue in that case was whether Petworth sold the large quantities of Robitussin AC it purchased from District Wholesale and Washington Wholesale, *330 and whether it failed to pay franchise tax on such sales. Subsequent to the trial in the instant case the Superior Court filed its opinion holding that Petworth had failed to prove it did not make the sales. The record in that case is not 24 before us. We recognize that our holding that Richard Rosenberg made the sales of Robitussin AC is inconsistent with the holding of the Superior Court, but such result is the petitioners' own doing. We decide the issues in the instant case on the record made here. The Rosenbergs, better than anyone else, know who made the sales. The burden of proof rests upon those who can most likely produce the facts to sustain it. If petitioners want to flimflam both courts by explaining nothing about the huge sales of Robitussin AC they must accept the consequences. They point to no invoices, sales slips or other competent evidence to demonstrate sales of Robitussin AC by Petworth.
The mysterious $57,574 in sales in 1969 of Petworth which were reported on its returns was never explained during the course of the trial.Richard and Jerry Rosenberg, the co-managers of Petworth in 1969, were evasive and unresponsive when questioned about that item. *331 Jerry Rosenberg testified that Marvin Riibner, the certified public accountant who prepared the 1969 income tax return of Petworth, increased the sales over that shown on the books and records. Riibner appeared as a witness but never explained the adjustment. 25 Richard Rosenberg testified that $57,000 of the $103,000 seized in his home in late February 1970 belonged to Petworth and the remainder was his. We do not believe this unsupported testimony.
We conclude that the $57,574 adjustment to sales of Petworth for 1969 was a spurious adjustment made in a fraudulent attempt to conceal the true ownership of the $103,000 found in Richard Rosenberg's home. We have held, therefore, that Petworth overstated its gross income in the amount of $57,574 on its Federal income tax return for 1969.
We hold that petitioner Richard Rosenberg has failed to establish that he was not the owner of the entire $103,000 which was found at his residence on February 28, 1970.
Even if we were to hold that Petitioner Richard Rosenberg destroyed the presumptive correctness of the Commissioner's determination and the burden, therefore, shifted to the Commissioner, we would find that such burden *332 was amply sustained.
We very carefully reviewed the steps followed by Revenue Agent Wampler in making his examination. The assumptions he made were reasonable and logical. He 26 reconstructed the unreported income of Richard Rosenberg in a meticulous and appropriate manner. Agent Wampler adequately proved that the large quantities of Robitussin AC purchased by Petworth were sold by Petworth to Richard Rosenberg at Petworth's cost. Because Petworth made no profit from such sales and because of the large sum of money found in the possession of Richard Rosenberg coupled with no satisfactory explanation of its ownership, it is clear to us that Richard Rosenberg earned the profit from the sale of Robitussin AC. The parties made no contention that Jerry Rosenberg made any sales of Robitussin AC in his own behalf.
Having found that Richard Rosenberg omitted income from his returns for the taxable years 1967, 1968 and 1969 as determined by the Commissioner (as modified by the Commissioner in his brief), our next inquiry is whether the omission of such income was fraudulent.
The burden of proof is on the Commissioner to prove that the omission of income is fraudulent. Sec. 7454(a), Internal Revenue Code *333 ; Rule 142, Tax Court Rules of Practice and Procedure. Such burden of proof must be carried by clear and convincing evidence.
In Foster, supra, the Court of Appeals for the Fourth Circuit observed that fraud could rarely be proved by direct evidence of the taxpayer's intention. 27 We conclude that most of the tests applied in that case are applicable here. As the Court stated at page 733 of 391 F.2d:
In deciding the fraud issue, the court must consider all the evidence properly before it, including the conduct of the taxpayer, the conduct of his business, and the circumstances surrounding the preparation of the alleged fraudulent return. [9] The Supreme Court, in Spies v. United States, 317 U.S. 492, 63 S. Ct. 364, 87 L. Ed. 418 (1943), has stated that "affirmative willful attempt may be inferred from * * * any conduct, the likely effect of which would be to mislead or to conceal." 317 U.S. at 499, 63 S. Ct. at 368. Several factors present in the record before us have been considered by other courts as evidence of fraud: Consistent and substantial understatement of income; [10] a taxpayer's motive behind the illegal derivation of income; *334 [11] willingness to make false statements under oath, where it appeared financially advantageous to do so; [12] concealment of ownership of property; [13] and refusal to cooperate in the income tax investigation.[14]
*335 28 Based upon the entire record in this case we conclude that the returns for 1967, 1968 and 1969 were fraudulent. As explained above, there were substantial omissions of income in each of the years. Indeed, Richard Rosenberg admitted that he failed to report the bonus of $25,300 from Petworth. There was an attempt to conceal the ownership of property; i.e., the $103,000 found in Richard Rosenberg's home. 29 The uncontradicted testimony of Agent Wampler demonstrates the lack of cooperation he encountered in conducting the investigation.
The Rosenbergs were not forthright in their testimony but were, instead, evasive, vague, and unresponsive. Petitioner Richard Rosenberg attempted to prove he reported all of his income by a cash flow statement prepared by his accountant yet he produced no evidence to support the amounts shown on the statement.
Based upon the entire record and our observation of the witnesses we have no difficulty in concluding that the income tax returns of Richard Rosenberg for 1967, 1968 and 1969 were fraudulent within the meaning of section 6653(b), Internal Revenue Code.
The remaining issue is the reasonableness of the *336 compensation paid by Petworth to Richard Rosenberg for the taxable year 1969. The Commissioner, in his statutory notice of deficiency, disallowed, as unreasonable, $25,000 of the total compensation paid to Richard Rosenberg in 1969. The amount disallowed represented a portion of a bonus of $25,300 purportedly paid by Petworth to Richard at the end of 1969. Petworth 30 deducted the bonus, Richard failed to report the bonus, and Petworth admits that the bonus was paid out of cash sales which it did not report on its return.
Petitioners introduced little proof to show that the compensation was reasonable. They proved no comparable compensation for other pharmacies. Petworth failed to prove that the compensation was reasonable above that allowed by the Commissioner.
Moreover, we conclude that the corporate minutes authorizing the bonus were fraudulently altered to explain the cash in Richard Rosenberg's possession. A copy of the minutes furnished Revenue Agent Wampler reflected a bonus to be paid Richard Rosenberg in the amount of $5,000. Petitioners sought to explain the alteration by the testimony of Jerry Rosenberg as to what his deceased father said. We do not believe *337 such testimony.
Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
9. 10 Mertens, Law of Federal Income Taxation Secs. 55.10, .16 (1964).↩
10. Holland v. United States, 348 U.S. 121, 139, 75 S. Ct. 127, 99 L. Ed 150 (1954); Kurnick v. Commissioner of Internal Revenue, 232 F.2d 678, 681 (6th Cir. 1956); Rogers v. Commissioner of Internal Revenue, 111 F.2d 987, 989 (6th Cir. 1940). We recognize that understatement of income alone is insufficient to support a finding of fraud. However, where other facts in the record indicate a fraudulent intent, we think that the size and frequency of omissions are to be considered in determining fraud. See Furnish v. Commissioner of Internal Revenue, 262 F.2d 727, 728-729 (9th Cir. 1958); Anderson v. Commissioner of Internal Revenue, 250 F.2d 242, 249-250 (5th Cir. 1957), cert. denied, 356 U.S. 950, 78 S. Ct. 915, 2 L. Ed. 2d 844 (1958); Bryan v. Commissioner of Internal Revenue, 209 F.2d 822, 828 (5th Cir. 1954), cert. denied, 348 U.S. 912, 75 S. Ct. 289, 99 L. Ed 715↩ (1955).
11. Cf. Commissioner of Internal Revenue v. Smith, 285 F.2d 91, 98↩ (5th Cir. 1960).
12. See J. E. Wheeler, 14 CCH Tax Ct. Mem. 989, 992 (1955)↩.
13. Furnish v. Commissioner of Internal Revenue, 262 F.2d 727, 729 (9th Cir. 1958); Remmer v. United States, 205 F.2d 277, 288 (9th Cir. 1953), rev'd on other grounds, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654↩ (1954).
14. Millikin v. Commissioner of Internal Revenue, 298 F.2d 830, 836 (4th Cir. 1962); Granat v. Commissioner of Internal Revenue, 298 F.2d 397, 398↩ (2d Cir. 1962).