J. ALBERT HUTCHINSON AND AUGUSTA P. HUTCHINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hutchinson v. Commissioner
Docket No. 2661-75.
United States Tax Court
T.C. Memo 1980-551; 1980 Tax Ct. Memo LEXIS 31; 41 T.C.M. (CCH) 531; T.C.M. (RIA) 80551; December 15, 1980
J. Albert Hutchinson, pro se. Milton B. Blouke, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TENNENWALD, Judge: Respondent determined deficiencies in petitioners' 1970 and 1971 Federal income tax of $ 4,317.96 and $ 1,520.18, respectively. Due to concessions, the remaining issues for decision are: 1. Whether petitioners are entitled to a $ 10,000 intangible drilling expense deduction in 1970; if so, whether petitioners must include in income $ 10,000 received in 1971 from the rescission of their participation in the Home-Stake 1970 Drilling Program. 2. Whether petitioners are entitled to an investment tax credit in excess of $ 70.14 for 1971. *35 3. Whether petitioners are entitled to overpayments of their income taxes for 1970 and 1971. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time they filed their petition, petitioners resided is San Francisco, California. Petitioner Augusta F. Hutchinson is a party solely by virtue of filing a joint income tax return with her husband. Consequently, in the interest of simplification, we will refer herein to "petitioner" in the singular; such reference will, depending on the context, refer to both petitioners or to petitioner J. Albert Hutchinson. Petitioner is an attorney. On November 9, 1970, petitioner entered into an agreement with Home-Stake Operating Corporation (Home-Stake) to purchase one participating unit in an oil and gas development program. In pertinent part, the agreement provided: [1]
*36 Our 1970 Program embraces nine specific projects, * * *. [The] total budget for the intangible drilling and development costs for the Program is $ 18,280,000. The Program is divided into 914 participating units, which taken together comprise 75 1/2% of the entire working interest in all of the oil and gas rights covering all of said projects * * *. This letter will confirm our agreement for the acquisition by you of one participating unit in our 1970 Program, which represents an undivided interest in the Joint Venture for the development of the oil and gas properties included in said Program (hereinafter sometimes called "Joint Venture"). Your fractional ownership in the 1970 Program shall therefore consist of the ratio which your number of participating units bears to the total of 914 participating units, applied to an undivided 75 1/2% interest in the Joint Venture. The said 75 1/2% interest is arrived at as follows. The total budget to acquire the properties in the Program, including leasehold costs and costs of existing equipment thereon, costs of all pipe, equipment, machinery and tankage and the costs of all labor and supervision to construct and install same, *37 in order to fully and completely outfit the properties for production, and all intangible drilling and development costs with reference to the properties is $ 24,213,330. The budgeted costs of all of said items except the intangible drilling and development costs are $ 5,933,330 (hereinafter called "capitalized costs"), which sum is 24 1/2% of the said total budget for all costs of $ 24,213,330. Home-Stake 1970 Program Operating Corporation (hereinafter called "Home-Stake"), as its contribution to the Joint Venture, will furnish all of said capitalized costs, and shall therefore receive an undivided 24 1/2% interest in the Joint Venture. The owners of the 914 participating units (hereinafter called the "Participants") shall furnish all of the funds required for all intangible drilling and development costs with reference to the properties, the budget for which is $ 18,280,000, and which sum is 75 1/2% of the total budget for all costs of the Program of $ 24,213,330. For their contribution, the Participants shall own an undivided 75 1/2% interest in the Joint Venture. All intangible drilling and development work shall be performed and completed by Home-Stake on a turnkey basis for *38 a fixed price of the said $ 18,280,000. We agree to make the same contract with all other Participants as this contract we are making with you. You agree to pay your proportionate part of the $ 18,280,000 which is budgeted for the intangible drilling and development costs for the 1970 Program. * * * Effective at the time you have recovered all of your said total expenditures, from the sales of production attributable to your interest in all properties in the Program, there shall revert to Home-Stake an undivided 20% of your working interest in each property with respect to which your total costs allocable to such property have been recovered from sales of production attributable to your interest in such property. * * * Each of the owners of interests in this Joint Venture (being all of the Participants and also Home-Stake) shall be entitled to deduct his share of operating costs and percentage depletion attributable to the properties of the Joint Venture in the proportion in which such owner shares income from the properties. The Participants shall be allocated all intangible drilling and development expenses of the Joint Venture. Home-Stake shall furnish all capitalized *39 costs as detailed above, and shall be allocated all depreciation deductions. Cost depletion in excess of percentage depletion and losses upon abandonment shall be allocated to Home-Stake. We shall maintain complete records of all property interests held or acquired under the terms of this agreement. We shall also Maintain accounting records to accurately and adequately determine costs and expenses attributable to your interest, together with all supporting data. All such records and data shall be available for inspection by you or your authorized representative during regular business hours at our principal office in Tulsa, Oklahoma. We shall also make available for inspection insurance policies (or certificates thereof), title opinions, or other evidence of title in connection with interests acquired for you, and such technical information with respect to the drilling program as may be in our possession. In addition to the above, we will furnish you an annual statement of income and expenses of the Joint Venture and provide you with the information required for your income tax returns. It is agreed that we are joint venturers in the development of the oil and gas properties *40 comprising the 1970 Program. We hereby elect, for Federal income tax purposes, to be governed by the provisions of all sections of Sub-chapter K of the Internal Revenue Code of 1954. It is our understanding that you intend to spend with us the total sum of $ 10,000.00 in 1970, and a like amount in 1971 * * *. Such sums shall cover your proportionate part of all intangible costs of drilling and developing the 1970 Program properties as fully developed producing properties. This commitment shall entitle you to one participating unit in the 1970 Program. If this is correct and if this letter fairly sets forth our understanding, will you please sign the counterpart of this agreement and return it to us? Upon receiving commitments from the other participants we shall advise you further. On December 16, 1970, petitioner mailed a $ 10,000 check to Home-Stake. Petitioner made no further contributions to the 1970 Program. Both petitioner and the 1970 Program used the cashbasis method of tax accounting. On February 11, 1971, the Securities and Exchange Commission (S.E.C.) filed suit against Home-Stake and its parent corporation alleging violations of the Securities Act *41 of 1933 relating to the sale of participating units in the 1970 Program. The defendants consented to the entry of a Final Judgment of Permanent Injunction and Other Relief whereby they were enjoined from: 1. Making estimates of oil reserves said to be recoverable from specific oil and gas recovery projects, which estimates do not have a reasonable basis in fact; 5. failing to disclose in an effective registration statement or a post-effective amendment thereto the fact that certain of the limited number of securities which are or purport to be the subject of such registration statement were sold prior to the effective date of the registration statement; 7. failing to comply fully with undertakings made in an effective registration statement; and 8. offering and selling more than the limited number of securities which are the subject of an effective registration statement while failing to inform all purchasers or purported purchasers of such securities of the oversubscription; On April 23, 1971, the United States District Court for the District of Columbia ordered Home-Stake "to make, an offer of rescission to each an every person, natural or corporate, who purchased *42 or agreed to purchase from * * * [Home-Stake] one or more units or fractional units of participation in its 1970 program of oil and gas recovery projects * * *." To facilitate the rescission offer, the District Court appointed the First National Bank and Trust Company of Tulsa, Oklahoma (the Bank) as rescission agent. Prior thereto, Home-Stake had deposited $ 23,080,000 in cash or cash equivalent in an escrow account with the Bank which amount represented the total receipts from th sale of participating units. Home-Stake filed an amended prospectus with the S.E.C. on April 16, 1971, in conjunction with the rescission offer. The rescission offer permitted each participant to elect to receive the return of his investment in the 1970 Program plus interest. Petitioner exercised his right to rescind and received $ 10,318.72 from the Bank in 1971. The amended prospectus, filed as part of the rescission offer, described in detail the nature of the 1970 Program. The 1970 Program, as finally formulated, involved eleven projects, all located in Venezuela. Of the eleven projects, four were secondary recovery projects utilizing water flooding techniques, and the remainder were primary *43 production projects. All the projects contained one or more producing or producible wells. In June 1970, Home-Stake entered into an independent joint venture agreement (Talon Joint Venture) with Talon Petroleum C.A. (Talon), a related Venezuelan corporation. Talon owned certain concession rights granted by the Venezuelan government to develop the 11 projects.The agreement between the related parties provided for Talon to contribute to the Talon Joint Venture the right to the use and enjoyment of the concessions arbitrarily valued at $ 24,213. In addition, Talon sold the existing pipes and equipment located on the projects to Home-Stake for $ 574,977.These pipes and equipment were then contributed to the Talon Joint Venture by Home-Stake. In exchange for its contribution, Talon received a one percent overriding royalty of the amounts received by the Talon Joint Venture from the sale of production, if any, from the properties and a one-tenth of one percent interest in the profits and losses of the 1970 Program. The 1970 Program intended to apply the $ 18,280,000 to be contributed by the program's participants in the following manner: COMPENSATION
For its services [Home-Stake] *44 will be compensated as follows: (1) A sum equivalent to 7% of the total investment of $ 18,280,000 to be made by participants in the Program, or approximately $ 1,279,600, will be paid to [Home-Stake] to cover, during the development period of the projects in the Program (estimated at approximately two years) all costs of management, including, but not limited to, costs of liability and other insurance for the benefit of [Home-Stake] and the participants in the Program, accounting, tax work, engineering evaluations and appraisals, home office overhead, including rent, secretarial and clerical costs, telephone and travel. (2) As stated under the heading "Application of Proceeds", [Home-Stake] estimates that the sum of $ 18,280,000 to be contributed by participants to the Program will be expended as intangible drilling and development costs. Such amount was computed as the sum required for the maximum development of the projects if future drilling and production warrant such development. To the extent that funds contributed by the participants are not actually required for the completion of the projects as presently contemplated by the Fixed Price Budget such funds will *45 be retained by [Home-Stake] as additional compensation. * * * In the event that continuance of any particular project in the Program is determined by [Home-Stake] to be commercially uneconomical, unexpended funds contributed by participants allocated to such project will be used on a turnkey basis to develop other development or waterflood projects selected by [Home-Stake] in its sole discretion and without further approval by participants. In the event that the unexpended funds by participants exceed the amount estimated for development of such new development or waterflood project, [Home-Stake] will retain such unexpended funds of participants as additional compensation. It is not intended, in any event, that any of the participants' contributions will be returned to them. * * * A supplemental order of the United States District Court for the Northern District of Oklahoma, in proceedings for the reorganization of Home-Stake Production Company, et al., filed on June 6, 1974, recited that as of December 31, 1972, that company had invested $ 4,371,598 in development work under the 1970 Program; that production for the wells in the 1970 Program was 675,000 barrels in *46 1971, 889,000 barrels in 1972, and 923,000 barrels in 1973; that gross oil sales derived by the company from the Venezuelan operations, which were mainly from the properties in the 1970 Program amounted to $ 4,482,977 as of December 31, 1972. On his 1970 joint Federal income tax return, petitioner reported a $ 10,000 loss from his participating interest in the 1970 Program. Petitioner attached to that return an income schedule prepared by Home-Stake Production Company, the parent corporation of Home-Stake, indicating that petitioner's $ 10,000 loss was attributable to intangible drilling and development expenditures. On his 1971 joint Federal income tax return, petitioner originally reported the $ 10,318.72 received in the rescission offer as a long-term capital gain. In an amended return mailed on April 13, 1972, petitioner deleted the $ 10,318.72 as long-term capital gain and reported $ 318.72 as interest income. In his statutory notice, dated December 27, 1974, respondent disallowed petitioner's 1970 intangible drilling expense deduction of $ 10,000. Alternatively, respondent included the $ 10,000 rescission payment as ordinary income to petitioner in 1971 under the tax *47 benefit rule. Petitioner's 1971 amended tax return reported an investment tax credit of $ 1,002 relating to petitioner's partnership interest in Jasmin Groves Company. This credit did not appear on petitioner's original 1971 return. Petitioner now concedes that the correct amount of the investment tax credit relating to 1971 is $ 70.14, the amount allowed by respondent in his statutory notice. At trial, upon petitioner's oral motion, the Court permitted petitioner to amend his petition for the purpose of claiming overpayments for 1970 and 1971. On his 1970 joint Federal tax return, petitioner reported a tax liability of $ 7,892.10. The total withholdings and estimated income taxes paid by petitioner for 1970 amounted to $ 10,720.70. The reported overpayment of $ 2,828.60 was credited to petitioner's 1971 estimated income taxes pursuant to his request. Petitioner's original tax return for 1971 reported a tax liability of $ 6,885.99. During 1971, petitioner paid estimated income taxes of $ 3,285 and had $ 199.20 withheld from wages. The balance due, $ 3,401.79, was paid by check when the 1971 return was filed. Petitioner's amended tax return for 1971 reported an overpayment *48 of $3,078.12 for that year. On the amended return, petitioner elected to have the overpayment credited to his 1972 estimated income taxes. The $ 3,078.12 reported overpayment was not applied to petitioner's 1972 taxes nor is there any indication that it was credited against any other tax liability. OPINION At the threshold, we are faced with certain broad assertions by petitioner which attack this proceeding in its entirety. First, petitioner argues that the notice of deficiency should be set aside and voided because it has the effect of including as income the same $ 10,000 item in both 1970 and 1971 tax years. Aside from the fact that we think it clear that the statutory notice conditioned the inclusion of the rescission payment on the deductibility of the intangible drilling expenses and therefore constituted alternative positions, respondent has now stipulated that, if we disallow the claimed deduction for intangible drilling expenses for the taxable year 1970, petitioner will not be required to include the 1971 rescission payment in income. Moreover, the fact that respondent *49 presents alternative claims for deficiencies is not grounds for setting aside the statutory notice of deficiency. Malat v. Commissioner,302 F. 2d 700, 706 (9th Cir. 1962), affg. 34 T.C. 365 (1960); Doggett v. Commissioner,66 T.C. 101, 103 (1976). Second, petitioner contends that the payment of a prior proposed deficiency relating to 1970 and the signing of a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870) should preclude respondent from asserting any further deficiency for that year. This argument must be rejected. If petitioner wished to bind respondent and prevent him from issuing any further notice of deficiency relating to 1970, he should have used the mechanism provided for in the statute and in the regulations, to wit, a closing agreement. Sec. 7121; sec. 301.7121-1, Proced. & Admin. Regs.; Findlay v. Commissioner,39 T.C. 580, 588-589 (1962), affd. in part and revd. in part on other issues 332 F. 2d 620 (2d Cir. 1964). See also Hudock v. Commissioner,65 T.C. 351, 362 (1975). There is no evidence that *50 the requirements of a closing agreement have been satisfied. See sec. 301.7121-1, Proced. & Admin. Regs. Mere payment of an asserted deficiency does not satisfy those requirements. Estate of Smith v. Commissioner,57 T.C. 650, 656 (1972), affd. 510 F. 2d 479 (2d Cir. 1975); Payson v. Commissioner,166 F. 2d 1008 (2d Cir. 1948), affg. a Memorandum Opinion of this Court. [2]
*51 Finally, petitioner claims that respondent erroneously assessed deficiencies for 1970 and 1971 because the tax accounts with the Internal Revenue Service reflect zero balances for these years. [3] Petitioner fails to realize, however, that these accounts merely indicate whether he has fully paid the tax liabilities originally reported by him on his 1970 and 1971 joint Federal tax returns. The fact that petitioner paid the tax liabilities as reported on the returns does not prevent respondent from questioning the correctness of those reported tax liabilities and from issuing a notice of deficiency. See Redcay v. Commissioner,12 T.C. 806, 809-810 (1949); sec. 301.6211-1 Proced. & Admin. Regs. See also the definition of a "deficiency" in section 6211. [4]
*52 We now turn our attention to the issue as to whether petitioner is entitled to a $ 10,000 deduction in 1970 for a share of prepaid intangible drilling expenses in respect of the 1970 Program. At the outset, we dismiss, as being without merit, petitioner's claim of an inherent or statutory right to the claimed deduction. No such right exists. Interstate Transit Lines v. Commissioner,319 U.S. 590, 593 (1943); Roberts v. Commissioner,62 T.C. 834, 836 (1974). Rather, petitioner must prove that the claimed deduction comes within the terms of a particular statute. Deputy v. duPont308 U.S. 488, 493 (1940); White v. United States,305 U.S. 281 (1938). We similarly reject, as being without merit, petitioner's attempt to establish that respondent's disallowance of the 1970 deduction was "arbitrary and erroneous" and constituted a "naked assessment" within the principles of Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Whatever may be the reach of *53 Weimerskirch in cases involving alleged unreported income, it does not extend to a situation where a disallowed deduction is involved. Compare Rockwell v. Commissioner,512 F. 2d 882, 885-887 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, with Herbert v. Commissioner,377 F. 2d 65, 69, 71 (9th Cir. 1967), revg. a Memorandum Opinion of this Court. The long and the short of the matter is that petitioner bears the burden of proving entitlement to the deduction in issue. Welch v. Helvering290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
In support of the claimed deduction, petitioner relies on the payment of $ 10,000 to the 1970 Program on December 16, 1970, and a letter received from the Home-Stake Production Company indicating a $10,000 loss from the 1970 Program in 1970, all of which was attributable to intangible drilling expenses. According to petitioner, these factors coupled with respondent's acceptance in Rev. Rul. 71-252, 1971-1 C.B. 147 of the District Court's opinion in Pauley v. United States, an unreported case ( S.D. Cal. 1963, 11 A.F.T.R. 2d 955, 63-1U.S.T.C. par. 9280), *54 are sufficient to substantiate the $10,000 deduction in 1970.
On the other hand, respondent contends that petitioner has failed to establish that he or the 1970 Program owned a working or operating interest in the Venezuelan properties in 1970 and that the 1970 Program paid or incurred any intangible drilling expenses during petitioner's tenure as a participant in the program, and that petitioner's reliance on Pauley v. United States,supra, and Rev. Rul. 71-252, supra, is misplaced. Section 263(c) authorizes a taxpayer to elect to deduct intangible drilling expenses in accordance with regulations prescribed by the Commissioner. Section 1,612-4, Income Tax Regs; which implements section 263(c), provides an option to capitalize or to deduct currently intangible drilling expenses incurred in the development of gas and oil properties. The option is available only to an "operator", who is defined as one who holds a working or operating interest in any tract or parcel of land either as a full owner or under a lease or any other form of contract granting working or *55 operating rights. Section 1.612-4(d) provides in part: The option granted * * * to charge intangible drilling and development costs to expense may be exercised by claiming intangible drilling and development costs as a deduction on the taxpayer's return for the first taxable year in which the taxpayer pays or incurs such costs * * *. If a taxpayer elects to expense intangible drilling costs, the appropriate year of deduction is determined pursuant to section 461 and the regulations thereunder. Since petitioner was a participant in the 1970 Program which elected pursuant to section 761 to be treated as a partnership for tax purposes, the claimed deduction for intangible drilling expenses is derived from the 1970 Program and is dependent upon proof that the partnership in respect of the 1970 Program was entitled to such a deduction. Secs. 701, 702(a), 703, 704; sec. 1.702-1(a)(8)(i), Income Tax Regs. See also Resnik v. Commissioner,66 T.C. 74, 79 (1976), affd. per curiam 555 F. 2d 634 (7th Cir. 1977). We have carefully reviewed *56 the record herein and have concluded that it is woefully inadequate to enable us to conclude that petitioner has carried the requisite burden of proof. Petitioner introduced none of the 1970 Program's records nor any evidence of the events that actually transpired on the joint venture level. Rather, most of the information regarding the 1970 Program was obtained from documents describing the 1970 Program's proposed activities, namely, the participation contract signed by petitioner and the amended prospectus filed by Home-Stake in conjunction with the rescission offer. No persuasive evidence was introduced to demonstrate that any of the proposed activities were actually undertaken in 1970. Although we appreciate the magnitude of the task confronting a joint venturer in proving the tax consequences of his participation in a large joint venture, it is nonetheless necessary for that joint venturer to substantiate the proper tax treatment by the joint venture before he can reap the benefits of the pass-through under section 702. In short, as we view the record here-in, the 1970 Program was no more than a paper transaction in 1970. [5]
*57 With respect to the issue of a working interest, we note that the 1970 Program, as finally formulated, involved 11 Venezuelan properties. The source of any working or operating interest in these properties was the development concessions granted by the Venezuelan government. In June 1970, these concession rights were held by a joint venture between Talon Petroleum C.A. and Home-Stake. We are not persuaded that these concession rights or any derivative rights were directly or indirectly transferred in 1970 to the 1970 Program. Cf. Cottingham v. Commissioner,63 T.C. 695, 706-707 (1975). Consequently, petitioner has failed to establish that the 1970 Program held a working or operating interest in the Venezuelan properties in 1970 and therefore, had the status of an "operator" pursuant to section 1.612-4(a), Income Tax Regs. Cf. Cottingham v. Commissioner,supra.
Our holding in respect of the absence of a working interest disposes of petitioner's claim to a deduction in 1970 for intangible drilling costs and makes it unnecessary for us to consider whether petitioner falls within the ambit of Pauley v. United *58 States,supra, and Rev. Rul. 71-252, supra. [6] We are constrained to observe, however, that our conclusion that the record herein reveals that the 1970 Program was nothing more than a paper transaction (see p. 17, supra and accompanying footnote 5) effectively distinguishes these pronouncements, as well as Estate of Goodall v. Commissioner,391 F. 2d 775 (8th Cir. 1968), affg. in part and revg. in part a Memorandum Opinion of this Court, relied upon by petitioner. In all three situations, activities were conducted -- albeit not involving drilling -- during the taxable year with respect to which a deduction for intangible drilling expenses was claimed. Although we do not decide the issue, we think that, at the very least, there is a substantial question as to whether a deduction can be claimed in a year prior to the time when any activities are carried on. In this connection, we note that the letter from Home-Stake and the accompanying schedule which was attached to the 1970 tax return is clearly hearsay and does not constitute proof of the truth of the matter asserted; respondent reserved his objection to its admission into evidence *59 other than as an attachment to the 1970 return and his objection is sustained. In view of our conclusion that petitioner is not entitled to a $10,000 deduction for intangible drilling costs in 1970 and respondent's concession (see p. 11, supra), we have no need to consider the tax implications of the $ 10,000 received by petitioner in 1971 as the result of his acceptance of the rescission offer. [7]
The second issue is whether petitioner is entitled to an investment tax credit in excess of $ 70.14 for 1971. On his 1971 amended tax return, petitioner reported an investment tax credit of $ 1,002 relating to his partnership interest in the Jasmin Groves Company. *60 Petitioner now concedes that the correct amount of the investment tax credit relating to 1971 is $ 70.14, the amount allowed by respondent in his statutory notice. Despite this concession, petitioner claims that the recomputation of the investment tax credit in 1976, when the partnership sold the asset on which the investment credit was based, somehow negates the effect of the 1971 overstatement. Furthermore, petitioner claims that any adjustment would be more than offset by a refund allegedly due petitioner for 1971. We find petitioner's arguments meritless. First, our jurisdiction applies only to the tax years in controversy. Sec. 6214(b); Commissioner v. Gooch Co.,320 U.S. 418 (1943); First Sec. Bank of Idaho, N.A. v. Commissioner,592 F. 2d 1046, 1047 (9th Cir. 1979). In this case, only 1970 and 1971 are in issue; whatever may have occurred in 1976 is not before the Court in this proceeding. Any recapture of the investment tax credit may affect 1976 but not 1971. Sec. 47(a). Because the parties are in agreement as to the appropriate investment *61 tax credit for 1971, we have no issue to adjudicate. Second, the existence of an overpayment in 1971 is independent of, and does not affect, our determination of whether petitioner correctly reported his aliquot share of the partnership's investment tax credit. The final issue is whether petitioners overpaid their taxes for 1970 and 1971. This Court is one of limited jurisdiction. We cannot order a refund. Morse v. United States,494 F. 2d 876, 879 (9th Cir. 1974); Robbins Tire & Rubber Co. v. Commissioner,53 T.C. 275, 279 (1969). We have jurisdiction only to determine whether an overpayment has been made. The extent of that jurisdiction is set forth in section 6512(b). Subparagraph (b) provides that no portion of such amount may be refunded unless the Court determines that such portion was paid within one of certain time periods prescribed therein. [8]
*62 Petitioner's claim for 1970 is based on his overpayment, through withholdings and estimated income tax payments, of the tax liability reported on his 1970 joint Federal tax return. The record indicates, however, that this overpayment was applied against petitioner's 1971 estimated income taxes pursuant to petitioner's request. See sec. 6402(b); sec. 301.6402-1, Proced. & Admin. Regs. The effect of this credit was to equalize petitioner's payments and his reported tax liability for 1970. The adjustments to be made in order to arrive at petitioner's 1970 tax liability in accordance with the Court's opinion and the parties' concessions will create a net deficiency, i.e., a greater tax liability than previously reported and paid. Accordingly, there is no overpayment to be computed for 1970. Sec. 6512(a). The basis for petitioner's 1971 claim is the amended tax return filed for that year. Petitioner's original tax return for 1971 showed a tax liability of $ 6,885.99. During 1971, petitioner paid estimated income taxes of $3,285 and an additional $ 199.20 by withholding. The balance due, $ 3,401.79, was paid by check when the 1971 return was filed. Subsequently, on April 13, 1972, petitioner *63 mailed to respondent an amended return for 1971 (Form 1040X). The amended return reported an overpayment for 1971 of $ 3,078.12. On the amended return, petitioner indicated that he wanted the overpayment credited against his 1972 estimated income taxes. It appears from the record that the reported overpayment was not so credited nor was it credited against any other tax liability. See footnote 10, infra.
As previously stated, a prerequisite to this Court's determination of an overpayment is compliance with the time limitations of section 6512(b)(2). The facts in this case comply with subsection 6512(b)(2)(C). The filing of an amended return constitutes a claim for refund. Sec. 301.6402-3(a)(2), Proced. & Admin. Regs. [9] Petitioner's amended return, i.e., his refund claim, was filed before the mailing date of the statutory notice of deficiency herein (December 27, 1974) and within the time prescribed by section 6511(b)(2)(A). See sec. 6512(b)(2)(C). Furthermore, there is no indication in the record that the claim for refund had been disallowed prior to December 27, 1974. See sec. 6512(b)(2)(C)(i). *64 In accordance with its jurisdiction, the Court will determine how much of the $ 6,885.99 paid by petitioners represents an overpayment for 1971. This determination will be based on the computation submitted by the parties pursuant to Rule 155, Tax Court Rules of Practice and Procedure.[10]
To reflect the foregoing, [11]
Decision will be entered under Rule 155.
Footnotes
1. Respondent, pursuant to an appropriate reservation of objection, objects on brief to the admission of the agreement as hearsay to the extent that it is offered as proof that the 1970 Program paid or incurred intangible drilling expenses. While we are satisfied that the agreement should be received in evidence as setting forth the undertakings of the parties, we agree that the agreement is not evidence that the undertakings (including the payment or incurrence of intangible drilling expenses) were in fact implemented and to that extent, respondent's objection is sustained. See also p. 19, infra↩.When we hereafter refer to the 1970 Program, we will be referring to the joint venture between Home-Stake and the participants including petitioner.
2. Petitioner should have realized that the payment of the proposed 1970 deficiency and the signing of Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) did not preclude the assertion of an additional deficiency for that year. On its face, Form 870 clearly states: The execution and filing of this waiver will expedite adjustment of the tax liability as indicated above. It is not, however, a final closing agreement under section 7121 of the Internal Revenue Code↩ and does not preclude assertion of a further deficiency in the manner provided by law if it is later determined that additional tax is due; nor does it extend the statutory period of limitation for refund, assessment, or collection of the tax.
3. In his reply brief, petitioner raises for the first time the issue of whether respondent complied with the 60-day requirement in section 6303(a), in respect of a Notice and Demand for Tax. It is obvious from petitioner's claim that he does not understand the Internal Revenue Code's procedures for the collection of taxes.The notice referred to in section 6303 is due 60 days after an assessment has been made pursuant to section 6203. However, subject to exceptions not applicable herein, an assessment pursuant to section 6203 may not be made in this case until a decision by the Court has become final. Sec. 6213(a). Accordingly, petitioner's claim is premature and is meritless in this proceeding. ↩
4. See also Baral v. Commissioner,T.C. Memo. 1978-383↩.
5. Even giving petitioner the benefit of the doubt (as we do) in terms of accepting the amended prospectus, which was not filed until April 16, 1971, as proof of facts existing during 1970, we cannot say that either it, nor any of the other Court documents stipulated into evidence, are sufficient to enable petitioner to carry the day. That prospectus is filled with language having future, rather than present implications. Moreover, it is significant that the various figures relating to investment, production, and sales (see p. 9, supra↩) speak only in terms of dates and periods after 1970.
6. See also Rev. Rul. 80-71, 1980-1 C.B. 106↩.
7. See Holbrook v. Commissioner,T.C. Memo. 1975-294↩. We note that given the time of the 1970 payment (December 16, 1970) and the implementation of the rescission offer (taking into account the recording of a June 15, 1971, date on the 1971 return for the receipt of $ 10,000 rescission payment), it would appear that even if petitioner were entitled to capital gain treatment it would be short-term rather than long-term gain as claimed.
8. Section 6512(b)(2) provides: (2) Limit on amount of credit or refund.--No such credit or refund shall be allowed or made of any portion of the tax unless the Tax Court determines as part of its decision that such portion was paid-- (A) after the mailing of the notice of deficiency, (B) within the period which would be applicable under section 6511(b)(2), (c), or (d), if on the date of the mailing of the notice of deficiency a claim had been filed (whether or not filed) stating the grounds upon which the Tax Court finds that there is an overpayment, or (C) within the period which would be applicable under section 6511(b)(2), (c), or (d), in respect of any claim for refund filed within the applicable period specified in section 6511 and before the date of the mailing of the notice of deficiency-- (i) which had not been disallowed before that date, (ii) which had been disallowed before that date and in respect of which a timely suit for refund could have been commenced as of that date, or (iii) in respect of which a suit for refund had been commenced before that date and within the period specified in section 6532.↩
9. Section 301.6402-3(a)(2), Proced. & Admin. Regs., as it read during the years in issue, provided: In the case of an overpayment for a taxable year of an individual for which a Form 1040 [or Form 1040A] has been filed, claim for refund may be made on Form 1040X ("Amended U.S. Individual Income Tax Return"). In cases to which this subparagraph applies, the taxpayer is encouraged to use Form 1040X.↩
10. If in the course of making up that computation, it appears that the overpayment for 1971 was in fact credited to petitioners' 1972 taxes in accordance with their request, the Court will take that fact into account in determining whether an overpayment for 1971 exists. The same procedure will be followed in respect of a potential payment of $ 1,320 in estimated taxes for 1971 discussed in petitioners' reply brief.↩
11. On brief, the parties address the appropriate amount of general sales taxes deductible by petitioner for 1971. The record indicates, however, that both parties agree that $ 390.22, the amount reported on petitioners' 1971 amended return, is the correct amount. Accordingly, there is no issue for us to resolve.↩