T.C. Memo. 1997-279


UNITED STATES TAX COURT


DON C. AND JUDY MONTGOMERY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20005-93.                    Filed June 18, 1997.


Don C. Montgomery and Judy Montgomery, pro sese.

<u>Cathleen A. Jones</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in, additions to, and penalty on, petitioners'
income tax for the years in issue:

| Year | Deficiency | Additions to Tax | | Penalty |
| | | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662 |
|------|-----------|-----------------|-----------|-----------|
| 1988 | $23,921 | $1,196 | $5,980 | -- |

| 1989 | 10,097 | -- | -- | $1,761 |
| 1990 | 615 | -- | -- | -- |

Unless stated otherwise, all section references are to the Internal Revenue Code as in effect for the years in issue.

After concessions, the issues remaining for decision are: (1) Whether petitioners realized unreported income from their activities in connection with their son-in-law's wholly owned corporation; (2) whether petitioners are liable for the addition to tax for negligence prescribed by section 6653(a)(1) with respect to their 1988 return; (3) whether petitioners are liable for the addition to tax for substantial understatement of liability prescribed by section 6661 with respect to their 1988 return; and (4) whether petitioners are liable for the accuracy-related penalty prescribed by section 6662 with respect to their 1989 return.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached to each are incorporated herein by this reference. Petitioners are husband and wife who filed a joint Federal income tax return for each of the years in issue. At the time they filed their joint petition in this case, petitioners resided in Oklahoma

City, Oklahoma.  All references to petitioner in this opinion are to Mr. Don C. Montgomery.

## Background

In 1980, petitioners' son-in-law, Mr. Tom Petty, was engaged in the fuel transportation business.  Mr. Petty owned a tractor-trailer suitable for hauling fuel which he leased to an organization in Houston, Texas, referred to as Petroleum Wholesale.  In 1982, Mr. Petty and petitioner decided to enter the fuel transportation business together.  They formed a company called "Pet-Don" to facilitate that activity.  Pet-Don's original capital consisted of one tractor-trailer which was contributed by petitioner.  When Mr. Petty terminated his lease agreement with Petroleum Wholesale, he also contributed his tractor-trailer to Pet-Don.

In March 1988, Mr. Petty purchased all of the outstanding capital stock of a going concern called H&B Transport, Inc. (H&B).  H&B's primary business activity consisted of transporting fuel for unrelated parties.  Mr. Petty hired a former employee of H&B to manage the company's operations in Oklahoma City.  Ill feelings soon developed between Mr. Petty and H&B's previous owner, who Mr. Petty felt had failed to honor an agreement to hire H&B

to transport freight.  Mr. Petty also grew distrustful of H&B's manager, who he felt was closely associated with the previous owner.  Because of this, Mr. Petty asked petitioner to oversee the disbursement of H&B's funds. Petitioner agreed, and in April 1988 he began to perform administrative and supervisory services for H&B, including writing and signing checks drawn on H&B's bank accounts. Petitioner never formally received a salary or other compensation for the services he provided to H&B.

H&B's primary checking account was with the First Interstate Bank of Oklahoma (First Interstate).  Both petitioner and Mr. Petty were authorized to sign checks drawn on this account.  There was a second checking account in H&B's name at Community Bank.  Petitioner was the only person authorized to withdraw funds from this account. Petitioner Judy Montgomery was an officer of Community Bank during the years in issue.

Petitioner's former sister-in-law, Ms. Ann MacKall, also performed services for H&B during the years in issue. Ms. MacKall worked in H&B's office performing basic bookkeeping and administrative functions.  Ms. MacKall never formally received a salary or other compensation for her services to H&B.

H&B's bookkeeping system involved the use of a "pegboard ledger", a sheet of checks held in place over a permanent ledger by means of pegs along the left side of a board.  Information written on a check was transferred to the ledger by means of carbon paper attached to the back of the check.  The ledger contained a column in which to enter deposits, a column in which to enter the current balance in the account, and a column in which Ms. MacKall or petitioner would sometimes enter comments about the purposes for which checks were issued.

During the period in issue, the dollar amounts of checks drawn on the First Interstate account are often greater than the current balance shown in the ledger.  In addition, there is no current balance shown for some periods.  Thus, checks would often be drawn despite an apparent balance of zero in the account, only to have a sufficient balance entered later without explanation.  Approximately once every month, Mr. Petty or his mother, Ms. Melba Petty, would travel to Oklahoma City to collect the bank statements and canceled checks.

H&B's drivers sometimes obtained fuel for their tractors from a tank located on the site where the tractors were parked.  On other occasions, the drivers would purchase fuel from unrelated third parties using cash

provided by H&B. H&B's drivers also needed to keep cash on hand in case a tractor-trailer required repairs while away from H&B's shop.

H&B required considerable quantities of cash to purchase fuel on behalf of its customers. Fuel distributors generally do not accept checks in payment for fuel unless the purchaser is well known to the distributor. Therefore, H&B was required to pay for the fuel it transported with cash or cashier's checks. H&B would often use its own funds to purchase the fuel it transported on behalf of its customers. H&B would then receive reimbursement when it delivered the fuel to the customer.

On several occasions during the years in issue, H&B transported fuel for a company called Trans State Pavers, Inc. (Trans State). Trans State was an unrelated corporation apparently owned by Mr. Bob White. H&B typically purchased the fuel that it transported for Trans State from Jordan Distributors. H&B generally used cashier's checks to pay for the fuel it purchased from Jordan Distributors. Trans State would then pay H&B's driver for the fuel by giving the driver either cash or a cashier's check at the time the driver delivered the fuel. The driver would give the cash or cashier's check received from Trans State to petitioner. In total, the amount of money petitioner

received from Trans State was equal to or exceeded the amount of the cashier's checks he gave to Jordan Distributors from H&B's funds. There were no deposits of cash or cashier's checks from Trans State into H&B's First Interstate account during the years in issue.

Sometime during the period in issue, petitioner learned that the Federal Government was soliciting bids for a contract to haul fuel for the U.S. Department of Defense. Petitioner caused H&B to submit a bid for the contract. H&B was awarded the contract and began hauling fuel for the Department of Defense. After H&B completed the contract, on or about May 1, 1989, the U.S. Government issued a check payable to H&B in the amount of $19,694.92 for H&B's work under the contract.

In June 1989, Mr. Petty moved to Oklahoma City and assumed control of H&B's operations. At that time, petitioner and Ms. MacKall stopped providing services to the company, and neither of them has had any involvement with H&B since then.

## Lincoln Mark VII Automobile

From 1988 to the time of trial, petitioner was in possession of a 1988 Lincoln Mark VII automobile. Although the title to the automobile lists Pet-Don as owner, it lists petitioners' residence as the owner's

address.  Both petitioner and Mr. Petty were present at the
time the automobile was purchased.  Mr. Petty made a cash
downpayment, and the remainder of the purchase price was
financed by the proceeds of a loan from Community Bank.
Because Pet-Don did not have sufficient credit to support
the loan, petitioners cosigned the financing agreement in
their individual capacities.  Petitioner used the Lincoln
Mark VII as his personal vehicle at all times between the
date of purchase and the date of trial.

During 1988, petitioner signed six checks totaling
$4,017.78 that were drawn on H&B's First Interstate account
and made payable to Community Bank.  These checks are as
follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 11/03/88 | 1335 | $669.76 | Community Bank |
| n/a[1] | 1428 | 669.76 | Community Bank |
| 04/01/88 | n/a | 669.50 | Community Bank |
| 04/28/88 | 1032 | 669.50 | Community Bank |
| 04/31/88 | 1253 | 669.50 | Community Bank |
| 10/04/88 | 1294 | 669.76 | Community Bank |
| Total | | 4,017.78 | |

[1]Not available

Each of these checks bears a notation stating that it was
issued as payment for petitioner's "company car".  A
notation on the pegboard ledger for check No. 1294 also
states "car payment".  These checks represent monthly

payments on the loan used to finance the purchase of the Lincoln Mark VII.

Petitioner signed three additional checks during 1988 that were drawn on H&B's First Interstate account in payment of miscellaneous expenses relating to the Lincoln Mark VII.  These checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 09/01/88 | 1247 | $200 | Don Montgomery |
| 09/27/88 | 1288 | 200 | Don Montgomery |
| 10/06/88 | 1297 | 200 | First Interstate |
| Total | | 600 | |

These checks were used to purchase such items as fuel, tires, maintenance service, and repairs for the Lincoln Mark VII.

During 1989, petitioner signed four checks totaling $2,679.04 that were drawn on H&B's First Interstate account and made payable to Community Bank.  These checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 01/06/89 | 1542 | $669.76 | Community Bank |
| 02/03/89 | n/a | 669.76 | Community Bank |
| 03/01/89 | 1694 | 669.76 | Community Bank |
| 04/01/89 | 1794 | 669.76 | Community Bank |
| Total | | 2,679.04 | |

Notations on all but one of these checks state that they were issued as payment for petitioner's "company car".

H&B's pegboard ledger also bears a notation for each of these checks stating "car payment".  These checks also represent monthly payments on the loan used to finance the purchase of the Lincoln Mark VII.

On January 17, 1989, petitioner signed check No. 1570 in the amount of $716.14 that was drawn on H&B's First Interstate account and made payable to Alexander & Strunk. This check bears the notation "Insurance - Co. cars".  This check was used to purchase insurance for petitioner's Lincoln Mark VII.

Sometime in March 1989, petitioner signed check No. 1759 in the amount of $850 that was drawn on H&B's First Interstate account and made payable to First Interstate. A notation on the front of the check states "Tires/Repairs Company Vehicle".  This check was also used to pay expenses relating to the Lincoln Mark VII.

Sometime after May 1, 1989, petitioner endorsed the check issued by the U.S. Government to H&B in the amount of $19,694.92 for the work done by H&B under its contract to transport fuel for the Department of Defense.  Petitioner deposited the check into H&B's checking account at Community Bank.  Petitioner then used the proceeds of the check to pay the outstanding balance of the loan used to purchase the Lincoln Mark VII.  Petitioner had no authority

to deposit this check into the Community Bank account or to apply the proceeds to the automobile loan.

Converted Payments From Trans State Pavers

During 1988, petitioner signed four checks in the aggregate amount of $18,033.42 that were drawn on H&B's First Interstate account and made payable to First Interstate.  Petitioner used the proceeds of each of these checks to purchase a cashier's check.  These checks and the cashier's checks that were purchased are as follows:

| Date | Check No. | Amount | Amount Of Cashier's Check |
|------|-----------|--------|---------------------------|
| 11/03/88 | 1338 | $1,534.63 | $1,532.63 |
| 11/07/88 | n/a | 6,526.39 | 6,523.39 |
| 11/09/88 | n/a | 6,500.00 | 6,500.00 |
| 12/08/88 | 1440 | 3,472.40 | 3,470.40 |
| Total | | 18,033.42 | 18,026.42 |

Each of the cashier's checks was made payable to Jordan

Distributor and lists Trans State as remitter.

Petitioner purchased three additional cashier's checks payable to Jordan Distributors during 1988 with checks totaling $17,950 that petitioner drew on H&B's First Interstate account and made payable to cash.  The amount of these checks and the cashier's checks that were purchased are as follows:

| Date | Check No. | Amount | Amount Of Cashier's Check |
|------|-----------|--------|---------------------------|
| n/a | 1358 | $9,500 | $9,500 |
| 11/02/88 | 1334 | 2,150 | 2,150 |
| 11/21/88 | n/a | 6,300 | 6,300 |
| Total | | 17,950 | 17,950 |

None of the cashier's checks purchased in the manner described above bears any notation indicating the purpose for which it was issued. The back of each check bears the statement "Cashier's Check issued in lieu of the check Payable to the same payee." We find that each of these cashier's checks was used to pay Jordan Distributors for the cost of fuel that H&B transported for Trans State. The difference, if any, between the amount of each check and the amount of the corresponding cashier's check represents a fee charged by First Interstate for issuing the cashier's check.

Each time Trans State received a shipment of fuel from H&B, its representative would pay H&B's driver for the fuel with either cash or a cashier's check. The H&B driver receiving the cash or cashier's check would then deliver the funds to petitioner. In total, the amount of money petitioner received from Trans State was equal to or exceeded the amount of money H&B paid to Jordan Distributors for the fuel, as reflected by the cashier's checks summarized above. Petitioner did not deposit any of

the money he received from Trans State into H&B's account at First Interstate.

## Wholesale Fuels, Inc.

In 1988, petitioner and several other individuals formed a corporation called Wholesale Fuels, Inc. (Wholesale Fuels).  Petitioner intended Wholesale Fuels to operate as a "jobber" for Pet-Don.  Mr. Petty and Mr. James Jordan each contributed $50,000 as capital to the corporation.  The original shareholders were petitioner, Mr. Jordan, H.T. Jordan, and Mr. Frank G. McGuire.  There is no evidence in the record that Mr. Petty held any stock in Wholesale Fuels at any time during the years in issue. On May 27, 1988, a bank account was opened in the name of Wholesale Fuels at Founders Bank in Oklahoma City, Oklahoma.  Both petitioner and Mr. Petty were authorized to sign checks drawn on this account.

On August 4, 1988, petitioner filed with respondent, on behalf of Wholesale Fuels, Form 637, Registration for Tax-Free Transactions Under Chapters 31, 32, and 38 of the Internal Revenue Code.  Petitioner signed the form as president of Wholesale Fuels, stating that the company was a wholesale distributor in the business of purchasing and selling heating oil.  The form bears a handwritten notation stating that it was revoked on February 12, 1990.

Sometime prior to September 29, 1988, Mr. Jordan, H.T. Jordan, and Mr. McGuire decided to withdraw from Wholesale Fuels. Mr. Petty thereafter repaid Mr. Jordan the $50,000 he had contributed to the corporation. The record does not disclose whether Mr. McGuire or H.T. Jordan had contributed any capital to the corporation, or whether they were repaid for any such contribution. On September 29, 1988, petitioner prepared, but did not send, a letter to the Internal Revenue Service stating that he was the sole shareholder of Wholesale Fuels, that Mr. Jordan, H.T. Jordan, and Mr. McGuire were no longer shareholders, and that the corporation was electing "small business corporation" status under subchapter S of the Internal Revenue Code.

Wholesale Fuels never conducted any business activity and never filed a Federal income tax return. However, the company did maintain its checking account at Founders Bank. Mr. Petty periodically used the funds in this account to pay expenses incurred on behalf of H&B. On July 21, 1988, petitioner signed check No. 1196 drawn on H&B's First Interstate account and made payable to Wholesale Fuels, Inc., in the amount of $6,000. Neither the check nor H&B's pegboard ledger bears any notation of the purpose for this

check.  The proceeds of the check were deposited into the Wholesale Fuels account at Founders Bank.

## Deposit Into H&B's Community Bank Account

On August 25, 1988, petitioner signed check No. 1241 in the amount of $1,500 that was drawn on H&B's First Interstate account and made payable to Community Bank. The proceeds of this check were later deposited into H&B's account at Community Bank.  Although there is no notation on the check itself, a note attached to the check written by Ms. Melba Petty states:  "Don says travel expense & repairs note: Deposited in H&B acct 1st Com Bank #252641".

## Miscellaneous Items

On December 22, 1988, petitioner signed check No. 1477 in the amount of $5,900.40 that was drawn on H&B's First Interstate account and made payable to First Interstate. A notation on the back of the check states that a cashier's check was issued in lieu of the check.  The front of the check also bears a notation stating "insurance".  A notation in the space on the pegboard ledger corresponding to this check states "Rockport Oil Insurance".

On January 3, 1989, First Interstate issued a cashier's check payable to the Oklahoma Automobile Insurance Plan for $5,100.40.  Petitioner purchased this

cashier's check with a portion of the proceeds of check No. 1477. The record does not disclose the reason for the $800 difference between check No. 1477 and the cashier's check. The record is also silent as to the nature of the insurance purchased.

On November 4, 1988, petitioner signed check No. 1346 in the amount of $1,500 that was drawn on H&B's First Interstate account and made payable to cash. Petitioner used the proceeds of this check to purchase a cashier's check. The record does not disclose to whom this cashier's check was payable, to whom it was remitted, or the purpose for which the proceeds were used.

Also during 1988, petitioner signed 17 checks in the aggregate amount of $11,086.84 that were drawn on H&B's First Interstate account and made payable to cash. These checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| n/a | 1214 | $200.00 | Cash |
| 04/05/88 | n/a | 500.00 | Cash |
| 07/19/88 | n/a | 400.00 | Cash |
| 10/12/88 | n/a | 200.00 | Cash |
| 10/18/88 | n/a | 150.00 | Cash |
| 10/21/88 | n/a | 200.00 | Cash |
| 10/27/88 | n/a | 200.00 | Cash |
| 10/24/88 | 1317 | 500.00 | Cash |
| 10/29/88 | n/a | 600.00 | Cash |
| n/a | 1373 | 300.00 | Cash |
| 11/25/88 | 1401 | 400.00 | Cash |
| 11/28/88 | 1406 | 800.00 | Cash |
| 11/30/88 | 1409 | 5,786.84 | Cash |
| 12/02/88 | n/a | 300.00 | Cash |
| 12/09/88 | 1444 | 200.00 | Cash |
| 12/12/88 | 1448 | 150.00 | Cash |
| 12/17/88 | 1463 | 200.00 | Cash |
| Total | | 11,086.84 | |

Some of the above checks bear notations stating that they were used to pay travel or other expenses. The pegboard ledger sheet also contains notations for some of these checks stating that they were used to pay travel and other expenses incurred on behalf of H&B.

During 1988, six checks were drawn on H&B's First Interstate account and made payable to petitioner. These checks total $9,577.62, and are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 05/19/88 | 1113 | $240.00 | Don Montgomery |
| 06/03/88 | 1271 | 137.62 | Don Montgomery |
| 06/28/88 | 1171 | 8,000.00 | Don Montgomery |
| 07/22/88 | 1200 | 500.00 | Don Montgomery |
| 08/19/88 | 1237 | 400.00 | Don Montgomery |
| 08/29/88 | 1242 | 300.00 | Don Montgomery |
| Total | | 9,577.62 | |

Check Nos. 1113 and 1271 bear notations stating that

they were issued to pay for travel expenses.  Check Nos.
1200 and 1237 bear notations stating that they were issued
to pay for "expenses".  Check No. 1271 was signed by both
petitioner and a "Mr. Moore".  Check No. 1171 was signed by
Mr. Petty.

During 1989, petitioner signed two additional checks
in the total amount of $5,175 that were drawn on H&B's
First Interstate account and made payable to cash.  These
checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 02/13/89 | 1621 | $675 | Cash |
| 02/21/89 | 1655 | 4,500 | Cash |
| Total | | 5,175 | |

Check No. 1621 bears a notation stating that it was issued
as repayment to Ms. MacKall for a previous cash deposit.
A notation on the pegboard ledger for this check states
"Repay money dep. 2/10 for SW Comm".  Check No. 1655 bears
a notation stating that it was issued as repayment to
Wholesale Fuels.  There is no entry on the pegboard ledger
for check No. 1655.

Also during 1989, petitioner signed two checks in the
total amount of $2,097 that were drawn on H&B's First
Interstate account and made payable to First Interstate.
These checks are as follows:

| Date | Check No. | Amount | Payee |
|------|-----------|--------|-------|
| 04/06/89 | 1808 | $395 | 1st Interstate |
| 04/17/89 | 1816 | 1,702 | 1st Interstate |
| Total |  | 2,097 |  |

Neither of these checks bears any notation, and the peg board ledger sheet on which these checks should appear was not introduced into evidence.

OPINION

At the outset, we note that respondent concedes part or all of four of the adjustments determined in the notice of deficiency. First, with respect to the adjustment increasing petitioners' income on the ground that petitioner realized unreported income from H&B of $81,865 in 1988 and $36,762 in 1989, respondent concedes $5,700 of the unreported income in 1988 and $5,500 in 1989. Second, respondent concedes the full amount of the adjustment charging petitioner with unreported rental income of $1,853 in 1989, and $979 in 1990. Third, respondent concedes, as incorrect, the adjustment disallowing petitioners' capital loss deductions of $3,000 per year in 1988 and 1989, and $3,146 in 1990. Finally, respondent concedes the additions to tax and penalties attributable to each of these conceded

items.  As a result of respondent's concessions, there is no deficiency for 1990.

In their post-trial briefs, petitioners argue that respondent's determination that petitioner received unreported income from H&B "is inherently arbitrary and excessive on its face".  Petitioners argue that respondent's determination is therefore not entitled to the presumption of correctness, and respondent bears the burden of proving "that the petitioners had unreported income."

Generally, a taxpayer bears the burden of proving that the Commissioner's determination of a deficiency is erroneous.  See Rule 142(a).  All Rule references are to the Tax Court Rules of Practice and Procedure.  However, in a case such as this, in which the Commissioner determines that a taxpayer realized unreported income, the Commissioner must provide a minimal evidentiary foundation for the deficiency determination before the presumption of correctness attaches to it.  See Erickson v. Commissioner, 937 F.2d 1548, 1551 (10th Cir. 1991), affg. T.C. Memo. 1989-552; Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Herbert v. Commissioner, 377 F.2d 65, 71 (9th Cir. 1966), revg. T.C. Memo. 1964-223; Estate of Dickerson v. Commissioner, T.C. Memo. 1997-165; Siebert v. Commissioner,

T.C. Memo. 1997-6; <u>Senter v. Commissioner</u>, T.C. Memo. 1995-
311. On rare occasions, when such a minimal evidentiary
foundation for the deficiency determination is not present,
this and other courts have not given effect to the
presumption of correctness and have shifted the burden of
going forward with the evidence from the taxpayer to the
Commissioner on the ground that the notice of deficiency is
arbitrary, i.e., without rational foundation in fact, or
excessive. See <u>Llorente v. Commissioner</u>, 649 F.2d 152 (2d
Cir. 1981), affg. in part, revg. in part, and remanding 74
T.C. 260 (1980); <u>Weimerskirch v. Commissioner</u>, <u>supra</u>;
<u>Dellacroce v. Commissioner</u>, 83 T.C. 269 (1984); <u>Jackson
v. Commissioner</u>, 73 T.C. 394 (1979).

This is not such a case. In this case, there is ample
evidence linking petitioner to the funds which form the
basis of the deficiency. Petitioner controlled and signed
checks drawn on H&B's bank accounts at First Interstate and
Community Bank, and H&B's drivers gave petitioner the cash
and cashier's checks they received from Trans State. Thus,
we find no basis to conclude that the notice of deficiency
is arbitrary or without foundation. Accordingly,
petitioners bear the burden of proving that respondent's
determinations are erroneous. See Rule 142(a).

The principal issue in this case is whether petitioner realized unreported income from his activities in connection with H&B. A taxpayer does not realize income by acting as a mere conduit for the transfer of funds on behalf of another. See Heminway v. Commissioner, 44 T.C. 96 (1965); Teschner v. Commissioner, 38 T.C. 1003, 1007 (1962); Mill v. Commissioner, 5 T.C. 691, 694 (1945); Drew v. Commissioner, T.C. Memo. 1972-40. However, "When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition," then he has realized income. James v. United States, 366 U.S. 213, 219 (1961); see also Meier v. Commissioner, 91 T.C. 273, 295 (1988). Thus, we must determine whether petitioner used the funds he withdrew from H&B's bank accounts for H&B's benefit, or whether he converted those funds to his personal use.

## Lincoln Mark VII Automobile

During 1988 and 1989, petitioner signed checks drawn on H&B's First Interstate account and made payable to Community Bank totaling $4,017.78 and $2,679.04, respectively. These checks represent payments on the loan used to purchase the Lincoln Mark VII.

In 1988, petitioner signed two additional checks drawn on H&B's First Interstate account and made payable to himself in the total amount of $400, and one made payable to First Interstate in the amount of $200. During respondent's examination, petitioner told the revenue agent that the proceeds of these checks were used to pay expenses relating to the Lincoln Mark VII.

On January 17, 1989, petitioner signed a check drawn on H&B's First Interstate account and made payable to Alexander & Strunk in the amount of $716.14. The proceeds of this check were used to purchase insurance for the Lincoln Mark VII. Sometime in March 1989, petitioner signed a check drawn on H&B's First Interstate account and made payable to First Interstate in the amount of $850. The proceeds of this check were also used to pay expenses relating to the Lincoln Mark VII.

On or about May 1, 1989, the U.S. Government issued a check payable to H&B in the amount of $19,694.92 as compensation for work H&B performed under a contract to haul fuel for the Department of Defense. Petitioner endorsed this check and deposited the proceeds into H&B's account at Community Bank. The proceeds of this check were then used to satisfy the outstanding balance of the loan used to purchase the Lincoln.

In this case, therefore, a total of $4,617.78 in 1988, and $23,940.10 in 1989, of H&B's funds was used to pay expenses related to the Lincoln Mark VII. Respondent determined that these amounts constitute income to petitioners because the Lincoln, at all relevant times, was used by petitioner as his personal vehicle. Petitioners bear the burden of proving that respondent's determination in this regard is erroneous. See Rule 142(a). We find that petitioners have failed to satisfy this burden.

Petitioners argue that these payments do not constitute income to them because the Lincoln was a "company car". Presumably, petitioners argue that the automobile was used for H&B's business purposes, or that the payments constitute nontaxable fringe benefits. We find this argument unpersuasive. First, the title to the automobile lists Pet-Don, not H&B, as owner. Second, petitioners have not shown that petitioner used the automobile for any purpose benefiting the title holder of the car, Pet-Don, or the payor of the subject payments, H&B. Petitioner did not maintain any record of the purposes for which the automobile was used, nor did he testify that it was used primarily to further H&B's business purposes. To the contrary, petitioner testified that he used a second

automobile, a 1981 Buick, to make business trips on behalf of H&B.

Petitioners also appear to argue that petitioner received the Lincoln in a like-kind exchange under section 1031. We find petitioners' argument without merit. Petitioner failed to introduce documentary evidence that he received the Lincoln Mark VII in exchange for a tractor-trailer, and there is no documentary evidence that petitioner owned a tractor-trailer other than the one he testified that he contributed to Pet-Don. Moreover, Pet-Don, and not petitioner, was the record owner of the Lincoln Mark VII at all relevant times. Essentially, petitioners argue that they exchanged a tractor-trailer which they did not own for an automobile which they did not own. This is clearly beyond the scope of section 1031.

Furthermore, section 1031 requires that both the property transferred and the property received in a like-kind exchange be held primarily for productive use in a trade or business, or for investment. Sec. 1031(a)(1). Petitioners have not shown that they held the Lincoln Mark VII for productive use in a trade or business or for investment. Thus, even if we accepted petitioner's characterization of the transaction, section 1031 would not apply in this case. Accordingly, we reject petitioners'

argument and sustain respondent's determination that all of H&B's payments toward the purchase of the Lincoln Mark VII, and its payments for insurance, tires, and other expenses related to the automobile, constitute income to petitioners.

Converted Payments From Trans State Pavers

During 1988, petitioner signed four checks drawn on H&B's First Interstate account and made payable to First Interstate in the total amount of $18,033.42. The proceeds of these checks were used to purchase cashier's checks totaling $18,026.42, each of which was payable to Jordan Distributors. Also in 1988, petitioner signed three checks drawn on H&B's First Interstate account and made payable to cash in the total amount of $17,950. The proceeds of these checks were also used to purchase cashier's checks payable to Jordan Distributors.

The above cashier's checks were used to purchase fuel from Jordan Distributors for delivery and sale to Trans State. There is no evidence that petitioner ever deposited the funds he received from Trans State into any of H&B's bank accounts or otherwise paid the funds to H&B. Respondent determined that petitioner converted the money he received from Trans State to his own personal use. Respondent determined that the amount of money so

converted, as measured by the amount of H&B's funds used to purchase the fuel, constitutes taxable income to petitioners.

Petitioners have failed to present any documentary evidence that petitioner paid the money he received from Trans State to H&B.  Although there appear to have been some unexplained deposits into H&B's First Interstate account during the years at issue, petitioners have failed to prove that the money petitioner received from Trans State was deposited into the account.  It is also clear that the source of funds used to purchase each of the cashier's checks made payable to Jordan Distributors consisted of checks drawn on H&B's First Interstate account.  Thus, we are unable to find that petitioner used the money he received from Trans State to pay Jordan Distributors for the fuel H&B transported between the two.

We note Ms. MacKall's testimony that petitioner either cashed the checks he received from Trans State and used the proceeds to purchase cashier's checks, or deposited cash received from Trans State into H&B's First Interstate account and then issued separate checks to purchase cashier's checks.  However, we do not credit Ms. MacKall's vague testimony on this point.  Moreover, there are no notations on the pegboard ledger evidencing deposits

corresponding to the cashier's checks purchased. Thus, there is no basis in the record to reject respondent's determination that petitioner converted the funds he received from Trans State to his own personal use.

Petitioners attached to their reply brief a copy of an alleged cashier's check payable to H&B for $8,420. This check was issued by Community Bank on November 23, 1988, and names Mr. Bob White, the owner of Trans State, as remitter. Petitioners argue that this check proves that the cashier's checks in question were purchased for business purposes, and that Trans State had reimbursed H&B for the fuel transported on its behalf. However, items included in briefs are not evidence. See Rule 143(b); Evans v. Commissioner, 48 T.C. 704, 709 (1967), affd. 413 F.2d 1047 (9th Cir. 1969). Further, the cashier's check was not delivered to respondent prior to trial, and respondent was not afforded an opportunity to question petitioners about the check. Accordingly, we will disregard this check.

Considering the facts and circumstances in the record, we find that petitioners have not met their burden of proving that petitioner did not convert the money he received from Trans State to his own personal use. We therefore sustain respondent's determination that the

amount petitioner received from Trans State, as measured by the amount of H&B funds used to purchase cashier's checks payable to Jordan Distributors, constitutes income to petitioners.

Wholesale Fuels, Inc.

On July 21, 1988, petitioner signed check No. 1196 drawn on H&B's First Interstate account and made payable to Wholesale Fuels in the amount of $6,000. This check was later deposited into the Wholesale Fuels account at Founders Bank. Respondent determined that because petitioner was the sole shareholder of Wholesale Fuels at the time the check was deposited into its bank account, the proceeds of this check constitute income to petitioners.

We agree with respondent's premise that a taxpayer realizes taxable income by diverting the funds of another to a corporation wholly owned by the taxpayer. See, e.g., Davis v. Commissioner, T.C. Memo. 1991-333. However, petitioner did not have sole dominion and control over the funds in the Wholesale Fuels account at Founders Bank. As found above, Mr. Petty periodically used the money in this account to satisfy expenses incurred on behalf of H&B. Thus, we find that the money deposited into the Wholesale

Fuels account at Founders Bank does not constitute income to petitioners.

Deposit Into H&B's Community Bank Account

On August 25, 1988, petitioner signed check No. 1241 drawn on H&B's First Interstate account and made payable to Community Bank in the amount of $1,500. A note attached to the check in Ms. Melba Petty's handwriting states: "Don says travel expense & repairs note: Deposited in H&B acct 1st Com Bank #252641". The proceeds of this check were deposited into H&B's account at Community Bank.

Respondent determined that amounts deposited into H&B's account at Community Bank constitute income to petitioners because petitioner was the only person authorized to withdraw funds from the account. See generally Bailey v. Commissioner, 52 T.C. 115 (1969), affd. 420 F.2d 777 (5th Cir. 1969). Petitioners argue that the money deposited into this account does not constitute income to them because the account was established and used for H&B's business purposes. However, petitioners have not shown that money in the Community Bank account was ever used to satisfy expenses incurred on behalf of H&B, or that the money deposited into the account belonged to H&B. At trial, petitioners introduced a document purporting to authorize Mr. Petty to sign checks drawn on the Community

Bank account. However, this document does not appear to have been filed with, or in any way accepted by, Community Bank. Petitioner himself was unable to recall how he obtained the document. Moreover, Mr. Petty testified that he "never signed anything at Community Bank". Petitioners have offered no evidence that Mr. Petty was ever authorized to withdraw funds from the account. Accordingly, we find that petitioner had exclusive dominion and control over the funds in the Community Bank account, and we sustain respondent's determination that all H&B funds deposited into the account constitute income to petitioners.

## Miscellaneous Transactions

On December 22, 1988, petitioner signed check No. 1477 drawn on H&B's First Interstate account and made payable to First Interstate in the amount of $5,900.40. In return, First Interstate issued a cashier's check payable to the Oklahoma Automobile Insurance Plan in the amount of $5,100.40. An entry in the space corresponding to check No. 1477 on H&B's pegboard ledger states "Rockport Oil Insurance". Respondent determined that the entire amount of the H&B check constitutes income to petitioners.

We find that $5,100.40 of the amount of check No. 1477 was used to purchase insurance for H&B and, thus, was used for H&B's benefit. In this regard, we note that H&B issued

a separate check to purchase insurance for the Lincoln Mark VII on January 17, 1989. Thus, the entire amount of the cashier's check is not income to petitioners. However, petitioners have offered no explanation of the additional $800 withdrawn from H&B's account, and there is no basis in the record on which we can reject respondent's determination that this additional $800 constitutes income to petitioners. Accordingly, we find that $800 of the proceeds of check No. 1477 constitutes income to petitioners.

On November 4, 1988, petitioner signed check No. 1346 drawn on H&B's First Interstate account and made payable to cash in the amount of $1,500. Petitioner used the proceeds of this check to purchase a cashier's check. However, petitioners have provided no explanation of how the proceeds of this cashier's check were used. Consequently, petitioners have failed to satisfy their burden of proving that the proceeds of check No. 1346 do not constitute income to them, as determined by respondent.

During 1988, petitioner signed 17 additional checks drawn on H&B's First Interstate account and made payable to cash in the aggregate amount of $11,086.84. Some of these checks bear notations stating the purposes for which they were drawn. H&B's pegboard ledger sheet also contains

notations of the purposes for some of these checks. Respondent argues that petitioners have not met their burden of proving that these checks do not constitute income because they did not introduce any receipts or other evidence to show how the proceeds were spent. Thus, respondent maintains that we must sustain her determination that the proceeds of these checks constitute income to petitioners.

Considering all of the facts and circumstances, we find that these additional checks payable to cash do not constitute income to petitioners. Ms. MacKall testified that petitioner often withdrew cash from H&B's First Interstate account to obtain funds necessary for H&B's daily operations. Although H&B's record keeping was, to say the least, informal and sloppy, we are nonetheless convinced that the proceeds of these checks were used to pay actual expenses incurred on H&B's behalf and were not converted to petitioner's personal use. Ms. MacKall provided summaries of the checks in question and testified as to how the proceeds were spent. We find Ms. MacKall's testimony credible in this regard and find that the proceeds of these checks do not constitute taxable income to petitioners.

Also during 1988, six checks were drawn on H&B's First Interstate account and made payable to petitioner in the total amount of $9,577.62. One of these checks was signed by both petitioner and a "Mr. Moore". One of the checks was signed by Mr. Petty. Some of the checks bear notations stating that they were issued to pay for travel or other expenses. Respondent determined that the entire amount of these checks constitutes income to petitioners.

We find that petitioners have not met their burden of proving that respondent's determination is erroneous insofar as the six checks payable to petitioner are concerned. These checks were issued contemporaneously with the checks payable to cash. However, petitioners have provided no explanation why some of the checks were payable to cash and others were payable to petitioner if all of the proceeds were used to pay expenses incurred on H&B's behalf. Furthermore, petitioners introduced into evidence a summary which states that check No. 1171, which was signed by Mr. Petty, was actually given to Mr. Petty. Petitioners claim that this check represents part of the proceeds of another check which was deposited into H&B's First Interstate account 11 days earlier. Petitioners' summary states that this deposit was made from Mr. Petty's personal funds, and that Mr. Petty used the proceeds of

check No. 1171 to pay business expenses. However, petitioners do not explain why Mr. Petty, who was away from Oklahoma City at the time, would write a check payable to petitioner to withdraw money from H&B's account for his own business purposes. We find petitioners' explanation in this regard both implausible and incredible.

During 1989, petitioner signed two checks, Nos. 1621 and 1655, drawn on H&B's First Interstate account and made payable to cash in the aggregate amount of $5,175. Check No. 1621 bears a notation stating that it was issued to repay Ms. MacKall for a previous cash deposit. The pegboard ledger entry for this check states "Repay money dep. 2/10 for SW Comm". The pegboard ledger entry for check No. 1655 states that it was issued to repay Wholesale Fuels for a cash deposit.

We find that neither of these checks constitutes income to petitioners. Ms. MacKall testified that she made a wire transfer of her own personal funds to Southwest Commercial Bank on H&B's behalf several days before check No. 1621 was issued. Ms. MacKall testified that she made this transfer to prevent H&B from incurring a fee for late payment. We find Ms. MacKall's testimony credible in this regard and find that check No. 1621 was issued to repay her

for this advance. Accordingly, check No. 1621 does not constitute income to petitioners.

Petitioners argue that check No. 1655, dated February 21, 1989, in the amount of $4,500, was issued to repay Wholesale Fuels for cash advanced by Wholesale Fuels. To support this claim, petitioners introduced a check drawn on the Wholesale Fuels account for $4,500 dated February 17, 1989. This check is payable to First Interstate and was endorsed by H&B.

We have already found that Mr. Petty periodically used money in the Wholesale Fuels account to pay expenses incurred on behalf of H&B. We therefore find that check No. 1655 represents a transfer of money between two accounts used by H&B. Accordingly, we find that the proceeds of check No. 1655 do not constitute income to petitioners.

Also during 1989, petitioner signed two checks drawn on H&B's First Interstate account and made payable to First Interstate in the aggregate amount of $2,097. Neither check bears any notation of its purpose, and the pegboard ledger sheet on which these checks should appear was not introduced into evidence. Petitioners have not provided any explanation of these checks. There is therefore no basis in the record on which to reject respondent's

determination that this amount constitutes income to petitioners.

## Additions to Tax and Penalty

Respondent determined that petitioners are liable for the addition to tax for negligence in 1988 as prescribed by section 6653(a)(1). During 1988, section 6653(a)(1) imposed an addition to tax equal to 5 percent of an underpayment if any part of the underpayment is attributable to negligence or disregard of rules or regulations. Sec. 6653(a)(1). For this purpose, negligence is defined as "any failure to make a reasonable attempt to comply with the provisions [of the Internal Revenue Code]". Sec. 6653(a)(3). Negligence includes any "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299); see also Hitchins v. Commissioner, 103 T.C. 711, 719 (1994). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6653(a)(3). Petitioners bear the burden of proving that respondent's determination of

negligence is erroneous.  See Rule 142(a); <u>Hitchins v.</u>
<u>Commissioner</u>, <u>supra</u>.

Petitioners have not introduced any evidence or made
any argument that they acted with reasonable care in
reporting their income for 1988.  Consequently, we find
that petitioners have failed to satisfy their burden of
proving that respondent's determination of negligence is
erroneous.

In addition to negligence, respondent determined that
petitioners are liable for the addition to tax for sub-
stantial understatement of income tax, as prescribed by
section 6661 with respect to their 1988 return.  As in
effect during 1988, section 6661 imposed an addition to
tax equal to 25 percent of any underpayment of income tax
attributable to a substantial understatement of liability.
Sec. 6661(a).  Respondent also determined that petitioners
are liable for the accuracy-related penalty prescribed by
section 6662 with respect to their 1989 return.  Section
6662 imposes a penalty equal to 20 percent of any under-
payment of income tax attributable to a substantial
understatement of liability.  Sec. 6662(a).

Both sections 6661 and 6662 define a "substantial
understatement" as an understatement of tax liability
equal to the greater of 10 percent of the tax required

to be shown for the taxable year or $5,000. Secs. 6661(b)(1)(A), 6662(d)(1)(A). In determining whether there is a substantial understatement of liability, the amount of an understatement is reduced by any portion attributable to the tax treatment of an item for which the taxpayer had substantial authority, and by any item with respect to which the relevant facts affecting the taxpayer's treatment are adequately disclosed in the return or in a statement attached to the return. Secs. 6661(b)(2)(B), 6662(d)(2)(B).

Petitioners bear the burden of proving that respondent's imposition of an addition to tax under section 6661 or penalty under section 6662 is erroneous. See Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860 (1982). Petitioners also bear the burden of proving that they had substantial authority for omitting an item from their return. See Tippin v. Commissioner, 104 T.C. 518, 535 (1995).

We find that petitioners have failed to satisfy their burden of proving that respondent's imposition of the addition to tax under section 6661 and penalty under section 6662 is erroneous in this case. Petitioners offered no authority for their position that the items

in question did not constitute gross income, and did not disclose the facts relating to these items in their returns or statements attached to their returns.  Accordingly, we sustain respondent's determination that petitioners are liable for the addition to tax for substantial under-statement of liability as prescribed by section 6661 with respect to their 1988 return, and the accuracy-related penalty as prescribed by section 6662 with respect to their 1989 return, insofar as they have understated their income tax liability.  However, because respondent has conceded a portion of the deficiency, and because we have found for petitioners on others, the amounts of the addition to tax and penalty shall be determined as part of the Rule 155 computation.

In light of the foregoing, and reflecting concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.